**COUNTY OF SUFFOLK, County of Nassau, Town of Islip, Town of Hempstead, Town of North Hempstead, Town of Oyster Bay, Town of Huntington, and the Board of Trustees of the Town, of Huntington and Concerned Citizens of Montauk, Inc., Plaintiffs-Appellees,**

**v.**

**SECRETARY OF the INTERIOR et al., Defendants-Appellants,**

**National Ocean Industries Association et al., and New York Gas Group, Intervenor-Defendants-Appellants.**

**The NATURAL RESOURCES DEFENSE COUNCIL, INC., Plaintiff-Appellee,**

**v.**

**SECRETARY OF the INTERIOR et al., Defendants-Appellants,**

**National Ocean Industries Association, National Supply Company, Continental Oil Company, Diamond M. Drilling Company, Digicon, Inc., Dresser Industries, Inc., Houston Oil & Minerals Corporation, Levingston Shipbuilding Company, Murphy Oil Corporation, Ocean Production Company, Transco Companies, Inc. and Zapata Corporation, Intervenor-Defendants-Appellants.**

Nos. 1187, 1258, Dockets 77–6049 and 77–6050.

United States Court of Appeals, Second Circuit.

Argued April 25, 1977.

Decided Aug. 25, 1977.

---

Irving .Like, Babylon, N. Y., Sp. Counsel for County of Suffolk (Patricia A. Dempsey, Atty., Richard C. Hand, Babylon, N. Y., of counsel), for plaintiff-appellee County of Suffolk.

William Gitelman, County Atty. of Nassau County, Mineola, N. Y. (John F. Picciano, Deputy County Atty., Mineola, N. Y., of counsel), for plaintiff-appellee County of Nassau.

William F. Dudine, Jr., New York City, for plaintiff-appellee Concerned Citizens of Montauk, Inc.

J. Christopher Jensen, Asst. U. S. Atty., Brooklyn, N. Y., John J. Zimmerman, Atty., Dept. of Justice, Washington, D. C. (David G. Trager, U. S. Atty., for the Eastern District of New York, Bernard J. Fried, Cyril Hyman, Asst. U. S. Attys., Brooklyn, N. Y., Lawrence R. Hoese, Atty., Dept. of Interior, Washington, D. C., of counsel), for Federal defendants-appellants.

Jon M. Kaufman, New York City (Kommel, Rogers, Kaufman, Lorber & Shenkman, Sarah Chasis, Atty., Natural Resources Defense Council, Inc., New York City, of counsel), for plaintiff-appellee Natural Resources Defense Council, Inc.

E. Edward Bruce, Washington, D. C. (Mark D. Nozette, Covington & Burling, Washington, D. C., Gene W. Lafitte, J. Berry St. John, Jr., Liskow & Lewis, New Orleans, La., George A. Burrell, New York City, of counsel), for intervenor-defendants-appellants National Ocean Industries Association, et al.

Shearman & Sterling, New York City (Robert L. Clare, Jr., W. Foster Wollen, Joseph T. McLaughlin, Kenneth M. Kramer, New York City, of counsel), for amici curiae Exxon Corp., Gulf Oil Corp., Mobil Oil, Shell Oil; Robert M. Perry, Houston, Tex., of counsel for Exxon Corp.; James A. Boone, A. Paul Brandimarte, Jr., New Orleans, La., of counsel for Gulf Oil Corp.; E. M. Sutter, R. B. Shaw, New Orleans, La., of counsel for Shell Oil Corp.; Arthur Aitkens, New York City, of counsel for Mobil Oil Corp.

Baker & Botts, Washington, D. C. (Gordon Gooch, John P. Mathis, Thomas B. Hudson, Washington, D. C., Gray Castle, Gen. Counsel, John T. Rafferty, NL Industries, Inc., New York City, of counsel), for amicus curiae NL Industries, Inc.

David J. Muchow, Gen. Counsel, American Gas Association, Arlington, Va. (Kevin B. Belford, Asst. Gen. Counsel, Arlington, Va., of counsel), for amicus curiae American Gas Association.

Willcox, Pirozzolo & McCarthy, Boston, Mass. (Jack R. Pirozzolo, Richard F. McCarthy, Boston, Mass., of counsel), for amicus curiae New England Council.

Rosenman Colin Freund Lewis & Cohen, New York City (Samuel H. Lindenbaum, Martin S. Baker, Thomas J. DeZure, New York City, of counsel), for amicus curiae Association For A Better New York, Inc.

Vinson & Elkins, Washington, D. C. (Rush Moody, Jr., Michael J. Henke, Washington, D. C., of counsel), for amicus curiae The Business Roundtable.

Stanley C. Van Ness, Public Advocate of the State of New Jersey, Trenton, N. J.

(Robert P. Corman, Asst. Deputy Public Advocate, Division of Public Interest Advocacy, Dept. of the Public Advocate, Trenton, N. J., of counsel), for amicus curiae Tri-County Committee.

Winer, Neuburger & Sive, New York City (David Sive, William Ginsberg, New York City, of counsel), for amici curiae Friends of the Earth, Inc., The Sierra Club and its Atlantic Chapter, The Wilderness Society, Long Island Sound Task Force, Inc., Long Island Environmental Council, Inc., Group for America's South Fork, Inc.

Drexel D. Journey, Gen. Counsel, F. P. C., Washington, D. C. (Robert W. Perdue, Deputy Gen. Counsel, Allan Abbot Tuttle, Sol., John J. Lahey, Atty., F. P. C., Washington, D. C., of counsel), for amicus curiae F. P. C.

Before MANSFIELD, Circuit Judge, SMITH, Chief Judge,* and PALMIERI, District Judge.**

MANSFIELD, Circuit Judge:

As our energy demands escalate, so does the running battle between the environmentalists and the exploiters of our natural resources. This appeal represents another skirmish in that confrontation. The principal issue is whether an Environmental Impact Statement (EIS) prepared by the Department of Interior for the purpose of determining whether to authorize a program for exploitation of our oil and gas resources contained sufficient information with respect to the environmental consequences of the proposed action and alternatives to satisfy the requirements of § 102(2)(C) of the National Environmental Policy Act (NEPA), 42 U.S.C. § 4332(2)(C). The genesis of the appeal lies in the decision of the Executive Branch of the United States, as part of this nation's development of new sources of urgently needed energy, to accelerate the leasing to private industry of our federally-owned Outer Continental Shelf (OCS) for oil and gas exploration,

---

* Of the United States District Court for the District of Montana, sitting by designation.

** Of the United States District Court for the Southern District of New York, sitting by designation.

development, and production, provided such operations might be undertaken in compliance with our National Environmental Policy Act, 42 U.S.C. § 4321, et seq.

Following the President's proposal in January, 1974, that off-shore leasing be accelerated to the extent consistent with environmental safeguards, a "programmatic environmental impact statement" (PEIS) was prepared by the Department of Interior which focused generally on the basic environmental impacts of such a major program and analyzed alternative energy sources (onshore oil and gas resources, oil shale, geothermal energy, solar energy and conservation). After nine days of hearings in Alaska, California and New Jersey, at which the testimony of some 344 witnesses was taken, the PEIS was revised and published in final form in three volumes on July 11, 1975. On September 29, 1975, the Secretary of Interior (Secretary) adopted a proposed accelerated leasing schedule.

Steps were soon taken to implement the Secretary's action. With respect to the mid-Atlantic OCS area, the Bureau of Land Management of Interior (BLM) designated a broad area off the New Jersey-Delaware-Maryland coast known as the Baltimore Canyon Trough for consideration, obtaining from 13 different government agencies reports as to the potential mineral resources in the area and the effect of exploitation on the resources and environment. Out of the designated area BLM selected 1,151 tracts (6.5 million acres) and asked private industry to specify those tracts which it might be willing to lease and state and local governments to designate those tracts which they believed should not be offered for leasing. Industry nominated 557 tracts (3.2 million acres), and the coastal states offered various comments. BLM then consulted with representatives of private industry and of Geological Survey to determine which tracts were believed to have the highest hydrocarbon potential and which posed environmental hazards, such as dangers to navigation and shipping, marine resources and habitat. On August 20, 1975, the BLM announced that 154 tracts located some 50 to 90 miles off the coast of New Jersey had tentatively been selected out of the 557 for proposed leases to be known as Sale 40.

Pursuant to this decision BLM prepared a draft site-specific Sale 40 Environmental Impact Statement (EIS) evaluating the environmental consequences of opening up this first offshore field in the Atlantic coastal area for oil and gas development. During August to October, 1975, interested parties, state representatives and those representing various federal agencies and bureaus were given an opportunity to review the working draft, which was published in December and became the subject of hearings in January, 1976, at which the testimony of 137 witnesses was taken and written comments were received and studied. On May 25, 1976, the Final EIS, consisting of four volumes totalling some 1,998 pages (not including some exhibits) which had been revised and amplified as a result of the testimony and comments, was published.

On June 30, 1976, the Secretary, after reviewing a Program Decision Option Document (PDOD) prepared by his staff, and after holding meetings to discuss the issues with his staff, announced his decision to go forward with lease Sale 40 on August 17, 1976. Within a matter of days the National Resources Defense Council, the State of New York,[1] and a number of Long Island counties and towns, in an action consolidated with an earlier action by the Counties of Suffolk and Nassau before Judge Weinstein of the United States District Court for the Eastern District of New York, brought suit to enjoin the proposed sale, alleging that the EIS did not comply with the requirements of § 102(2)(C) of the National Environmental Policy Act, 42 U.S.C. § 4332(2)(C).[2] On August 13, 1976, Judge

---

1. The State of New York subsequently withdrew from the case.

2. In addition, plaintiffs alleged violations of the Coastal Zone Management Act, 16 U.S.C. §§ 1451 et seq.; the Administrative Procedure Act, 5 U.S.C. §§ 704–706; the Outer Continen-

Weinstein, after hearings, granted a preliminary injunction against the lease sale. Recognizing that oil spills presented the greatest environmental risk of offshore oil development, that tankers generally spill far more oil than pipelines in transporting oil to shore, and that the EIS assumed that pipelines would be used at the Sale 40 site, the court found *sua sponte* that the EIS had not explored adequately the possibility that affected state and local governments would bar the landing of pipelines on their shores and thereby necessitate the use of tankering and increase the hazards of oil pollution.

Three days later we stayed enforcement of the preliminary injunction, finding no reason to believe that irreparable harm would occur pending the ultimate resolution of the lawsuit if the lease sale were allowed to take place. Justice Thurgood Marshall refused to vacate our stay, noting in his written opinion issued August 19, 1976, that the sale could always be voided in the event NEPA violations were ultimately found. 429 U.S. 1307, 97 S.Ct. 4, 50 L.Ed.2d 38 (1976). On August 17, therefore, the Secretary conducted lease Sale 40 as scheduled accepting bids on 93 tracts within the sale area, for which bonuses totalling $1.128 billion were paid, and executing leases of those tracts to the successful bidders for exploration and development of oil and gas. We reversed the grant of the preliminary injunctive relief for substantially the same reasons as those underlying our stay of its enforcement. 551 F.2d 301 (2d Cir. 1976).

The suit came to trial in early 1977 and, on the basis of further testimonial and documentary evidence, the district court again concluded that the requirements of NEPA had not been met. Relying on the testimony of a Shell Oil Company executive called by defendant-intervenor National Ocean Industries Association, Judge Weinstein found that the EIS could have and should have projected possible pipeline routes, and that it then would have been possible to evaluate the acceptability of those routes under existing state and local land use controls, the environmental impacts of those routes, and the economic feasibility of pipelining. Secondly, the court found that the EIS and its accompanying program decision option document (PDOD) substantially overestimated the projected daily production of the field and underestimated finding costs and the costs of pipeline construction, thereby overstating the economic feasibility of pipelining oil to shore and rendering the picture of overall costs and benefits unrealistically attractive. Thirdly, the court held that the EIS should have discussed the effect of tract selection on pipeline routes and evaluated the alternatives of offering for lease less-environmentally hazardous tracts, which had not been offered, in lieu of tracts actually offered. Finally, the court found that the EIS inadequately discussed the alternative of postponing the decision to lease until after further federal exploration of the area. For these reasons Judge Weinstein, concluding that the EIS violated NEPA, declared the leases null and void and enjoined the parties from exercising any powers purportedly granted by the leases.

Defendants here challenge all of Judge Weinstein's findings of deficiencies in the

tal Shelf Lands Act, 43 U.S.C. §§ 1331 *et seq.;* laws dealing with state ownership of land up to 3 miles offshore, 43 U.S.C. §§ 1301–1303, 1311 *et seq.;* laws relating to the administration of public lands, 43 U.S.C. §§ 1361 *et seq.;* laws regulating the administration of fish, shellfish and wildlife resources, 16 U.S.C. §§ 742 *et seq.;* laws relating to the protection and conservation of wildlife, 16 U.S.C. §§ 661 *et seq.;* laws protecting migratory game and birds, 16 U.S.C. §§ 701 *et seq.;* laws governing fish restoration and management projects, 16 U.S.C. § 777; the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 *et seq.;* laws relating to land and water conservation funds, 16 U.S.C. §§ 460*l*–5 *et* *seq.;* the Anadromous Fish Conservation Act, 16 U.S.C. §§ 757a *et seq.;* the Migratory Bird Treaty Act, 16 U.S.C. §§ 703 *et seq.;* the Marine Protection, Research, and Sanctuaries Act of 1972, 16 U.S.C. § 1431 *et seq.;* the Marine Mammal Protection Act, 16 U.S.C. §§ 1361 *et seq.;* the Intergovernmental Cooperation Act, 42 U.S.C. §§ 4201 *et seq.;* fair value market requirements for sales and leases, 31 U.S.C. § 438a; the Energy Supply and Environmental Act, 15 U.S.C. §§ 791 *et seq.;* the Energy Policy and Conservation Act, 42 U.S.C. §§ 6201 *et seq.;* Executive Order No. 11912, and a number of manuals, guidelines, and orders relating to the preparation of environmental statements.

EIS. In addition, they contend that the district court should not have considered *de novo* testimony as to the accuracy of the Department's scientific and economic data, that it should not have reviewed the PDOD at all, and that even if the EIS was inadequate the district court had no power to remedy any violation by voiding the leases. Because we agree with appellants that the EIS and its accompanying PDOD were not inadequate, we reverse.

## DISCUSSION

■ A threshold issue is the standard of review by which we are governed. To the extent that Judge Weinstein's findings resolve any disputed issues of evidentiary fact we are, of course, governed by the mandate of Rule 52(a), F.R.Civ.P., that they "shall not be set aside unless clearly erroneous." Moreover, where such findings are based on demeanor testimony, as distinguished from documentary proof which we are in as good a position as the district court to appraise, the district judge's findings will be set aside only in exceptional circumstances, *United States v. Aluminum Co. of America,* 148 F.2d 416, 433 (2d Cir. 1945) (L. Hand); see also *Alabama Power Co. v. Ickes,* 302 U.S. 464, 477, 58 S.Ct. 300, 82 L.Ed. 374 (1938); *Adamson v. Gilliland,* 242 U.S. 350, 353, 37 S.Ct. 169, 61 L.Ed. 356 (1917); *Davis v. Schwartz,* 155 U.S. 631, 636, 15 S.Ct. 237, 39 L.Ed. 289 (1895). However, a less restrictive standard of review is to be applied upon review of a district judge's determination for reasons unrelated to testimonial credibility that an EIS fails to contain sufficient information to satisfy § 102(2)(C) of NEPA. In making such a determination a court is governed by the "rule of reason," under which an EIS need not be exhaustive to the point of discussing all possible details bearing on the proposed action but will be upheld as adequate if it has been compiled in good faith and sets forth sufficient information to enable the decision-maker to consider fully the environmental factors involved and to make a reasoned decision after balancing the risks of harm to the environment against the benefits to be derived from the proposed

action, as well as to make a reasoned choice between alternatives. *Natural Resources Defense Council v. Callaway,* 524 F.2d 79, 93 n.12 (2d Cir. 1975); *Sierra Club v. Froehlke,* 534 F.2d 1289, 1299 (8th Cir. 1976); *Sierra Club v. Morton,* 510 F.2d 813, 819 (5th Cir. 1975); *Environmental Defense Fund, Inc. v. Corps of Engineers,* 492 F.2d 1123, 1131 (5th Cir. 1974); *Natural Resources Defense Council, Inc. v. Morton,* 148 U.S.App.D.C. 5, 458 F.2d 827, 834 (1971).

■ Such a determination, although it may be labelled a "finding" by the district court, is not strictly a finding of fact but rather an exercise in judgment as to what is reasonable under given circumstances which, of course, may vary from case to case. Although the district judge's evidentiary findings may remain undisturbed, it is our duty to insure that the district court has properly applied the rule of reason in judging the adequacy of an impact statement and has interpreted NEPA in light of its evident purposes, which are " 'to enable those who did not have a part in [the EIS'] compilation to understand and consider meaningfully the factors involved,' and to compel the decision-making to give serious weight to environmental factors in making discretionary choices." *Sierra Club v. Morton,* 510 F.2d at 819. In performing this duty we are in as good a position as the district court to determine on the undisputed facts what could reasonably be demanded of the EIS in issue. With these principles in mind we turn to the district court's decision.

*Claim that EIS failed to consider effect of state and local regulations on the mode of transportation to be used and to project "likely" pipeline routes and landfalls.*

The district court found that the EIS, after assuming that pipelines rather than tankers would be used to transport any discovered oil ashore, "virtually ignored" the powers of state and local governments along the coast to block or impose heavy burdens on pipelines and thereby to necessi-

tate the use of tankers and increase the risk of oil pollution. Referring to the zoning ordinances of numerous municipalities along the coast, which could be used to bar or restrict placement of pipelines within their respective jurisdictions, the district court noted that "the number of authorities with power to affect the [pipelining] operation multiplies into the thousands."

In fact, as the district court acknowledged, the EIS does contain numerous references to state and local regulatory powers and procedural requirements that could be invoked to restrict pipelines, their landfalls, onshore routes, activities, operation, and effects. Repeatedly the EIS advises that all onshore development associated with the offshore oil and gas operations, including pipeline sites, routing and use, would be controlled by state and local authorities and be subject to their approval and regulation through land use controls.[3] However, the district court brushed these references aside as too vague and abstract. Judge Weinstein reasoned that in order to assist a decision-maker in making practical determinations the EIS should have projected routes that pipelines would be "likely" to take from the field to refineries in New York, Philadelphia and Baltimore, even though no oil had as yet been discovered within the half-million acres of ocean bottom, some 50 miles by 50 miles in size, which was under consideration for lease, and even though one could not specify the

location or locations where it should be discovered, much less the quantity and quality of oil that might be discovered. Any projected routes would of necessity, therefore, have to be arbitrary, and might bear no similarity to the routes that would actually be proposed upon discovery of oil. The court nevertheless concluded that, if projections of such "likely" routes had been prepared and used, the EIS could then have assessed the extent to which the proposed development of the Sale 40 area conformed to existing state and local land use regulations prevailing in the locations of the projected routes, the environmental consequences of such pipeline routes, and the extent to which it was realistic in political and economic terms to expect that pipelines would in fact be used. In support of his analysis, Judge Weinstein noted that Shell Oil Company had made such projections as part of its feasibility and cost study in developing a bidding strategy for the sale.

■ Appellants contend that such route projections and concomitant examinations of existing land use controls would be of no value to a decision-maker, since the building of pipelines is at least three years down the road, and likely routes cannot be projected until oil is discovered, its source located, and its quality, quantity and pumpability determined. Since the pipeline routes can be fixed only after these factors are known and their location is subject to control by the government, the issues raised are divisi-

---

**3.** The EIS states that onshore development "can ultimately be broadly controlled by the states," Vol. I, EIS, p. 40, that "any OCS-related facility development in the coastal zone would be subject to these [state] regulations," *id.* p. 50, that the location of onshore facilities, including terminal and storage facilities, operations bases, gas processing plants and onshore pipelines, depends on how land use controls are exercised by the states, Vol. II, EIS, pp. 450–51, 453–54, that "state and local planning and regulatory authorities provide the primary framework" for location of pipelines *id.* p. 456, that pipeline planning must be coordinated by the Secretary with the affected states, that pipeline approval "would be within the jurisdiction of the State," *id.* p. 586, and that the use of pipelines would depend on the "receptivity of state and local jurisdictions to the approval of the necessary pipeline landfalls."

Similarly, the PEIS repeatedly makes it clear that all onshore development, including pipelines, is subject to state regulatory authority, Vol. I, PEIS, pp. 131–33, Vol. II, PEIS, pp. 193–94, 774, 908–9, 951–52, 1004–5.

State regulatory programs with respect to onshore activities are thoroughly discussed in the EIS, Vol. I, pp. 58–61, as is the status of state Coastal Zone Management Act programs under federal and state legislation, Vol. II, EIS, pp. 266–91.

Finally, Volume III of the EIS, which publishes the responses of the Department of Interior to questions, criticisms, and comments, repeatedly adverts to the fact that the placement of pipelines in state waters and on shore is subject to state and local land use regulations and approvals. See, e. g., Vol. III, EIS, p. 32.

ble from those presented by the sale of the leases and can finally be resolved at a later point. In taking this position appellants do not go so far as to suggest that the EIS should dispense with the necessity of collecting such relevant facts as are now available and of discussing their possible environmental significance. It is recognized that the EIS must consider all significant environmental consequences that can reasonably be expected to flow from the decision to which the EIS relates. An EIS cannot safely ignore clear environmental consequences of the decision at hand on the ground that another statement will be forthcoming later. Since the lease contract presented for the Secretary's consideration would grant to each lessee of a tract the right for five years to search for oil and gas in economic quantities and upon such discovery to produce and transport the oil and gas to shore as long as it could be produced in paying quantities, it was essential to consider and weigh the environmental aspects of transportation, as well as of exploration and production, to the extent "meaningfully possible," see NRDC v. Morton, 458 F.2d at 837, before deciding whether to authorize the leasing program.

The EIS here does indeed discuss in considerable detail the environmental risks involved in transporting any oil that might be discovered. Its discussion proceeds, however, on the basis that, because the development of our nation's offshore oil and gas deposits is too massive and long-term a project to be covered adequately in any single EIS of practical utility for decision-making purposes, the project must logically be broken down into possibly three stages according to the federal action proposed to be taken with a separate EIS and evaluation by the Secretary before proceeding with each such step. The first stage or step was to decide whether to accelerate the Department's offshore leasing program at all and, if so, in what order to offer the various offshore fields. This threshold decision was aided by the preparation of a programmatic environmental impact statement (PEIS), which discussed other major alternatives for meeting the nation's energy needs and evaluated in general terms the environmental problems of offshore oil and gas production. If the Secretary had decided not to authorize leasing of the OCS, no further action would be required. However, on the basis of the PEIS, the Secretary announced an accelerated leasing program on September 29, 1975, which necessitated proceeding further.

The second stage was to decide what specific offshore areas might be offered for lease. Since the PEIS would not be sufficient for use in deciding whether to go forward with the leasing of specific areas, it was contemplated that the Department would prepare a more detailed site-specific impact statement for each sale area. Accordingly, to aid the Secretary in deciding whether to proceed with lease Sale 40, the instant EIS was prepared, discussing oil and gas pollution problems that might be expected to arise in the Sale 40 area generally, including problems arising out of transportation of oil to shore. The Sale 40 EIS, however, although it assumes that pipelines will be used, does not commit the Department to specific routes or modes of transportation. Instead, the EIS contemplates that a more specific consideration of and commitment to routes and modes of transportation will occur once it has been determined where, if anywhere, oil or gas exists within the rather sizeable sale area (over 500,000 acres) and in what quantity and quality. The lessee of a tract where oil is discovered will be required, before beginning production and transportation, to present a development plan, including specific pipeline routes, that will be subject to the review and approval of both the Secretary and affected coastal states. The Secretary has announced that before considering whether to approve any such plans a Development Plan EIS will be prepared, which will include a survey of the environmental consequences and feasibility of specific pipeline corridors and of any other problems relating to specific proposals for the transportation of oil and gas actually found.

With this program for consideration of environmental consequences according to developmental stages in mind, the question upon this appeal is not whether the Sale 40 EIS failed completely to discuss the environmental risks involved in transporting oil to shore from the tracts under consideration for lease but whether a limited discussion, with the balance deferred until preparation of a Development Plan EIS, satisfies the "rule of reason" by which we are governed in determining whether there has been compliance with NEPA. In our view the answer, and the extent to which treatment of a subject in an EIS for a multistage project may be deferred, depends on two factors: (1) whether obtaining more detailed useful information on the topic of transportation is "meaningfully possible" at the time when the EIS for an earlier stage is prepared, see *Natural Resources Defense Council v. Morton*, 458 F.2d at 837, and (2) how important it is to have the additional information at an earlier stage in determining whether or not to proceed with the project, see *Natural Resources Defense Council v. Callaway*, 524 F.2d at 88.

If the additional information would at best amount to speculation as to future event or events, it obviously would not be of much use as input in deciding whether to proceed. As we said in *Callaway, supra,* referring to *Morton, supra :*

> "NEPA does not require a 'crystal ball' inquiry . . . An EIS is required to furnish only such information as appears to be reasonably necessary under the circumstances for evaluation of the project rather than to be so all-encompassing in scope that the task of preparing it would become either fruitless or well nigh impossible, *Indian Lookout Alliance v. Volpe*, 484 F.2d 11 (8th Cir. 1973). A government agency cannot be expected to wait until a perfect solution of environmental consequences of proposed action is devised before preparing and circulating an EIS." 524 F.2d at 88.

Where the major federal action under consideration, once authorized, cannot be modified or changed,[4] it may be essential to obtain such information as is available, speculative or not, for whatever it may be worth in deciding whether to make the crystallized commitment (e. g., the construction of a bridge of a specified type between two precise points). But where a multistage project can be modified or changed in the future to minimize or eliminate environmental hazards disclosed as the result of information that will not become available until the future, and the Government reserves the power to make such a modification or change after the information is available and incorporated in a further EIS, it cannot be said that deferment violates the "rule of reason." Indeed, in considering a project of such flexibility, it might be both unwise and unfair not to postpone the decision regarding the next stage until more accurate data is at hand.

Applying these principles here, although it was possible to project hypothetical pipeline routes from various parts of the enormous Sale 40 area to points on shore, just as Shell Oil Company had done as part of a study of the economic feasibility of pipelining oil and gas from the area in preparation for bidding on the Sale 40 tracts, it is clear that such a procedure would not yield information of practical use to the Secretary for the purpose of determining what onshore zoning and environmental problems would be encountered. In effect the procedure would amount to a meaningless exercise, for several reasons. The placement of a pipeline depends on a number of vital factors just as important as compliance with local land use requirements—the size and location of the oil discovery, its distance from shore, the type of oil discovered, its final destination, and the ocean bottom. It is not known where, if at all, oil or gas will be discovered in the enormously far-flung Sale 40 area. Thus it is impossible to determine where in the field the pipelines would originate. Second, no comprehensive ocean bottom survey has been conducted of the vast region between the field and the coasts of New Jersey and Delaware; a determina-

---

4. *See generally* F. Anderson, NEPA in the Courts (1973) and sources cited therein.

tion of the best ocean bottom corridors would therefore also be entirely speculative. Third, under the Coastal Zone Management Act, 16 U.S.C. §§ 1451, *et seq.*, the location of pipeline landfalls and onshore pipeline routes must conform to the Coastal Zone Management Act (CZMA) plans of the affected states. Until the relevant states finish drafting their CZMA plans, therefore, onshore pipeline routes cannot be determined. Finally, at the time the EIS was drafted it was not even known whether companies with refineries in New York, Baltimore, or Philadelphia would make successful bids. It is still not known which companies will find oil, nor is it known whether any oil found will be of a type that existing refineries can process. Thus it is not possible at this point to specify probable pipeline destinations. To require the EIS to specify such routes at this stage would be equal to demanding that the Department specify the probable route of a highway that may never be built from points as yet unknown to other points as yet unknown over terrain as yet uncharted in conformity with state plans as yet undrafted. A more speculative exercise can hardly be imagined. While speculation in an EIS is not precluded, the agency is not obliged to engage in endless hypothesizing as to remote possibilities. There comes a point when the chain of "ifs" gets too long and too tenuous to be of any practical use. That point was reached here.

Moreover, even if "likely" pipeline routes could be projected and existing land use regulations affecting the proposed onshore routes could be analyzed, the information would be of little or no utility in determining the impact of state and local exercise of regulatory powers, since each of the states and municipalities affected could change its regulations from favorable to unfavorable, or vice versa, between the publication of the EIS and the date, some three years or more later (assuming discovery of oil and approval of the corridors by the Secretary), when applications might be made to local authorities for the necessary land use authorizations. It is extremely unlikely that in the meantime any state or municipalities would issue an advisory opinion or statement of intent based on projected landfalls or onshore routes that would be purely speculative in nature. The exercise of power over land use could not, therefore, be ascertained by any meaningful degree for some time to come.

Judge Weinstein's reliance on the testimony of Franklin Brunjes and the pipeline feasibility study made by him for Shell Oil Company, moreover, is misplaced. That study did not purport to project probable or "likely" pipeline routes. It merely hypothesized some lines from arbitrarily-selected points in the ocean to similar points on shore, in order to show that pipelines could be used economically over long and circuitous routes. It demonstrated that routes might be shifted as much as a dozen miles north or south without substantially altering the cost of pipelining oil to shore. As Brunjes conceded, in order to make his analysis he was forced to assume not only that oil would be discovered but such basic facts as the location of the discovery, the "timing, quantity, quality, destination, what the cost for various routes and modes of transportation are".[5] He further agreed

---

5. The tenuousness of Mr. Brunjes' hypothesis is attested to by his testimony as follows:

Q. Would you state to the Court the basic criteria or assumptions under which the cost information is developed?

A. To do a study . . . [o]ne has to assume oil will be found and also where the oil would be found.

. . . . .

We also had to assume how it would be developed and what the decline rate would be on the production, generally the life of the field.

. . . .

We also had to assume the quality of oil, whether it was pumpable or not, what its characteristics are.

We also had to assume there would be . . . a normal type oil that could be processed by existing refineries in the Northeast area and particularly the Philadelphia area.

. . . .

Pumped for purposes of transportation— and we assumed that on the right of way that wherever possible that existing corridors would be used.

that changes could occur in some or all of these key variables which would materially change his estimates. Subject to these conditions, the study supports the EIS's assumption that pipelining would be economically feasible. But, for the reasons we have noted, a determination of the environmental impact of pipeline routes and of their conformity with land use controls requires specificity that is not possible at this stage, simply because the specific information is not available. Information of the type used by Mr. Brunjes, while useful for economic feasibility purposes, would be virtually useless speculation for environmental impact purposes. In fact, Mr. Brunjes himself testified that it was "very premature at this time to speculate as to an exact routing involved and who would participate, the exact destination".[6]

 Nor does it appear that such information as to pipeline routes was essential to enable the Secretary to make the necessary environmental assessment to proceed with this stage of the project, see *Natural Resources Defense Council v. Callaway, supra*, 524 F.2d at 88, since his decision does not preclude him from requiring in the future

> In summary on this, what it tells us is that as the distance increases, as far as pipelines are concerned, and as the assumed volume drops off, that pipeline costs do increase and they do compare fairly close to tanker transportation. I think we looked at—in looking at lesser volumes, lower than 125 thousand barrels a day production rate, that tankers and pipelines became much closer. That is comparing the long route—comparing the short route to the tanker, even at low production rates, the pipelines are much less expensive.
>
> . . . . .
>
> Q. Let's see if I understand. What that means is that the cost figures that you put into testimony yesterday in your expert opinion, any one of those numbers could be wrong by 25 percent?
> A. Right. They could vary one way or the other up to 25 percent. That's what we strive for.

6. In effect Mr. Brunjes confirmed that due to the hypothetical nature of the assumptions used in his study and the fact that state and local laws might be changed during the period of at least two years before pipelining and pipeline sites would be selected, it would be

that pipeline routes be modified or altered or from imposing additional conditions and safeguards on pipelining that will in effect permit its use only if it is environmentally acceptable. Should oil be discovered and the information essential for pipeline-routing become available, any lessees discovering oil must present development plans to the Department, including proposed pipeline routes, for approval. Before making that decision the Secretary will prepare a Development Plan EIS that should furnish the detail needed to assess the environmental consequences of any decision with respect to routes. By that time, moreover, the Secretary will also have the benefit of federal-state-local programs developed under the Coastal Zone Management Act, 16 U.S.C. § 1451 *et seq.* (CZMA), under which each affected coastal state, working in coordination with the federal government, prepares a coastal zone program defining areas authorized for various facilities, including pipelines, CZMA § 304(5), 16 U.S.C. § 1453(5), to which the offshore lessees must adhere. As Judge Weinstein acknowledged, "The states concerned with Sale No. 40 leasing have made substantial efforts to carry out the Management Act's purposes.

necessary to study the conditions later, testifying:

> Q. What are the many conditions that you refer to which you say could seriously affect facets of the study and which have not yet been defined by state and Federal authorities?
> A. One facet that occurs to me is possibly that you know, any local entity, a county, any state government, could adopt regulations or laws that would affect the routing of the pipeline.
>
> . . . . .
>
> Q. Are you able to tell us, then, what is meant here by facets of the study that have yet to be defined by Federal authorities?
> A. I believe in general terms that there are laws, regulations that are in fairly constant state of evolvement, and while I am no expert in the area I believe that there are—like EPA regulations that are continually being reviewed and promulgated, and that one, you know, should not make any decision on until they get to the point or near the point of making the decision and then try to determine what all of the latest laws and regulations and likely regulations that would be involved that would affect the pipeline.

They are in the advanced stages of the work." (Mem.Op. 8/13/76). The mid-Atlantic CZMA programs will be prepared and federally-approved long before any pipeline-siting and construction could occur as part of the development phase of lease Sale 40, so that the development plans submitted to the Secretary for approval will be required under § 307(c)(3) of CZMA to certify that they are consistent with the relevant states' programs, 16 U.S.C. § 1456(c)(3). Indeed, New Jersey expects to submit its CZMA program for federal approval in 1977.[7] In the meantime, under Department of Interior regulations, 30 CFR 250.34 as modified, OCS lessees must, 30 days before submitting their development plans to the U.S. Geological Survey, furnish detailed information to affected coastal states, (OCS Order No. 15, 41 F.R. No. 204, 10/20/76), and the governors of the affected states are then given 60 days after submission of a development plan to review and comment on it, and to delay approval until their objections are resolved. Each development plan, moreover, must be submitted at least six months in advance of the contemplated date for commencement of operations in order to allow time for adequate review by the affected states.

Appellees, relying on *Union Oil Company v. Morton*, 512 F.2d 743 (9th Cir. 1975), argue in effect that, while the Secretary may have some leeway to alter or influence the location of future pipeline routes, he is in effect boxed in by his current decision and that by authorizing the lease sale he has irrevocably committed himself to allowing transportation of any oil that may be discovered in economic quantities, even if it should turn out that the means to be used, whether tanker or pipeline, are not environmentally acceptable, because of land use, economic, technical or other reasons. Hence, they contend, the environmental problems raised by specific pipeline routes must be resolved now. We disagree.

Had the Secretary retained less power to regulate the transportation phase of the Sale 40 project, appellees' arguments might have some merit. However, under § 5(a)(1) of the Outer Continental Shelf Lands Act, 43 U.S.C. § 1334(a)(1), the Secretary possesses full power to prescribe "such rules and regulations as may be necessary" to protect the environment from hazards posed by exploitation of the continental shelf. Although a lease may be formally cancellable only for violation of pre-existing regulations, 43 U.S.C. § 1334(b), § 5(a)(1) provides that "The Secretary may at any time prescribe *and amend* such rules and regulations . . . and, *notwithstanding any other provisions herein*, such rules and regulations shall apply to all operations conducted under a lease issued or maintained under the provisions of this subchapter" (emphasis supplied), and the Sale 40 leases provide that each lessee must in its OCS operations comply with the Secretary's regulations as they may be revised or supplemented to provide for prevention of waste, for conservation of the OCS and for protection of correlative rights therein. In any event, a willful violation of subsequently-issued regulations would constitute a misdemeanor, 43 U.S.C. § 1334(a)(2), and could provide the basis for injunctive relief. A properly-adopted later regulation would have the force of law, the public interest in compliance would be persuasive in inducing

---

7. In its Final Memorandum opinion the district court quotes a statement by New Jersey Governor Brendan Byrne at Department of Interior hearings on Jan. 27, 1976, regarding the Sale 40 EIS as support for the court's conclusion that the federal government should have considered "likely" or specific pipeline routes and landfalls. On the contrary, Governor Byrne was in fact arguing that route and pipeline siting should be deferred until the federal and state governments could coordinate coastal planning activities as envisaged by the CZMA, which is the procedure being followed by the Department, and contending that no such sites should be specified or assumed "without adequate consultation with State or local officials now engaged in developing a coastal management strategy and program pursuant to State and federal law" (Final Memorandum, p. 12). Confirming this approach the State of New Jersey later published "Interim Land Use and Density Guidelines of the Coastal Area of New Jersey," which states that "detailed site selection . . . would be premature at this time." (Ex. 225, p. 21).

the courts to grant relief, *Virginian Ry. Co. v. System Federation No. 40,* 300 U.S. 515, 552, 57 S.Ct. 592, 81 L.Ed. 789 (1937), and the government's control over the seabed and its threatened resources by virtue of the OCS Lands Act, 43 U.S.C. § 1332(a), would give it standing to seek injunctive relief, see *United States v. Ray,* 423 F.2d 16, 22 (5th Cir. 1970).

Nor are the Secretary's powers with respect to pipeline routes limited by the provision in Stipulation No. 4 that no crude oil may be transported ashore by tankers if the laying of pipelines "is technically and economically feasible." As we read the stipulation the Secretary retains the power to require that environmentally safe pipelines be used even if the use of tankers or more hazardous pipelines might be cheaper. Indeed, under Stipulation No. 4 of the lease the Secretary "specifically reserves the right to require that any pipeline to be used for transporting production from this lease to shore be placed in certain designated areas or corridors." Economic feasibility is not to be determined merely by comparing pipeline costs with tanker costs and deciding which would be more profitable for the lessees. Nor does the stipulation in any other way limit the power of the Secretary to mandate the use of an environmentally acceptable means of pipeline transportation if technically feasible.

Finally, appellees argue that in the event use of pipelines is not economically and technically feasible, the Secretary will nevertheless be required to permit transportation of the oil ashore, by tankers if necessary, citing *Union Oil Company, supra.* Should the Secretary determine that only pipelining is environmentally acceptable, however, even though economically and technically unfeasible at the moment, under § 1334(a)(1) he retains ample authority to suspend operations until a technology is developed under which use of pipelines is economically and technically feasible. See 30 C.F.R. § 250.12(c); *Union Oil Company,* 512 F.2d at 751–52.

We therefore conclude that projection of specific pipeline routes was neither "meaningfully possible," nor "reasonably necessary under the circumstances." The Secretary will be in a much better position to make a realistic and specific assessment of problems relating to specific routes when, assuming oil is discovered, the lessees submit development plans. At that time, after preparing and examining the Development Plan EIS he may modify or disapprove the pipeline routing for environmental reasons. We agree with the Fifth Circuit's conclusion, when faced with a similar contention:

"This project is an easily divisible one. In this continuously controllable project, the fact that a tract may prove productive would not mandate that an unsound method of delivering that production be utilized. We are not unmindful of the rule that the sufficiency of an EIS must be determined without reference to *possible* future action. Today's statement, however, includes sufficient pre-statement analysis of possible environmental hazards from pipeline location, construction or leakage." *Sierra Club v. Morton,* 510 F.2d 813, 824 (5th Cir. 1975) (emphasis in original).

We therefore cannot agree with the district court that failure to project specific pipeline routes and to assess their conformity with existing land use regulations rendered the EIS fatally defective.

*The Cost-Benefit Analysis Of The Sale 40 Project.*

To aid the Secretary's decision on lease Sale 40, the Bureau of Land Management drafted, in addition to the Sale 40 EIS, a program decision option document (PDOD) outlining possible alternative courses of action for the Secretary's consideration. This PDOD was not merely a summary of the EIS, but included in addition a cost-benefit analysis of the Sale 40 project, most of which was not duplicated in the EIS. After reviewing both of these documents, the Secretary authorized the lease sale.

The district court found that "the economic costs and benefits of the planned action were seriously and grossly misrepresented or omitted" by the PDOD, due to underestimates of finding and pipeline costs

and overestimates of peak production rates, resulting in an overstatement of the likelihood that pipelines would be used and in an inadequate balancing of economic benefits against environmental costs. (Final Mem. Dec. p. 58, 2/17/77).

■ The court based these conclusions entirely on the testimony of one George L. Donkin, an economist called by plaintiffs whom the court found to be "completely reliable and credible," and on documentary evidence relied on by Donkin. Although professing not to make a "substantive review of the administrative decision," the district judge found the Secretary's balance of economic benefits against environmental costs to "be arbitrary and capricious and in violation of NEPA." (Fin.Mem.Dec. pp. 79–81, 2/17/77). We disagree. In our view, the Department of Interior made an adequate compilation of relevant information, analyzed it reasonably, and did not ignore pertinent data. The district court, on the other hand, by substituting its judgment and its appraisal of the evidence for that of the Department, exceeded the proper scope of judicial review.

■ Before getting to the cost-benefit data itself, it is important to define the role of the district court in reviewing this aspect of an EIS for the purpose of determining whether there has been compliance with NEPA. The district court does not sit as a super-agency empowered to substitute its scientific expertise or testimony presented to it *de novo* for the evidence received and considered by the agency which prepared the EIS. *Environmental Defense Fund v. Froehlke*, 368 F.Supp. 231, 240 (W.D.Mo. 1973), *aff'd*, 497 F.2d 1340 (8th Cir. 1974). The court's task is merely "to determine whether the EIS was compiled in objective good faith and whether the resulting statement would permit a decisionmaker to fully consider and balance the environmental factors." *Sierra Club v. Morton*, 510 F.2d at 819. "The court is not empowered to substitute its judgment for that of the agency." *Scenic Hudson Preservation Conference v. FPC*, 453 F.2d 463, 468 (2d Cir. 1971) *cert. denied*, 407 U.S. 926, 92 S.Ct. 2453, 32

L.Ed.2d 813 (1972), *quoting Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). This is particularly true when it comes to evaluating the factual conclusions of the EIS. If the agency's conclusions have a "substantial basis in fact," *FPC v. Florida Power & Light Co.*, 404 U.S. 453, 463, 92 S.Ct. 637, 30 L.Ed.2d 600 (1972), and if the EIS has set forth responsible opposing scientific views, *Committee for Nuclear Responsibility v. Seaborg*, 149 U.S.App.D.C. 380, 463 F.2d 783 (1971), it is not for the district court to resolve conflicting scientific options. Evidence-weighing must be left to the agency making the policy decision. See *Udall v. Washington, Virginia and Maryland Coach Company*, 130 U.S.App.D.C. 171, 398 F.2d 765, 769 (1968), *cert. den.*, 393 U.S. 1017, 89 S.Ct. 620, 21 L.Ed.2d 561 (1969). Were the court to invade that province, the judiciary rather than the agency would become the policy-maker. Any agency decision with which the court disagreed on the merits could then be nullified as "arbitrary" merely because the court, upon receiving additional evidence, chose to rely upon it or to give it greater weight than that considered by the Executive Branch.

The question before the district court was whether the authors of the EIS made an objectively adequate effort, judged in light of the "rule of reason," to compile and present all significant environmental factors and alternatives for the decision-maker's consideration. Where evidence presented to the preparing agency is ignored or otherwise inadequately dealt with, serious questions may arise about the adequacy of the authors' efforts to compile a complete statement.

■ All of this does not mean that the district court erred in considering the PDOD upon its review of the EIS or in receiving additional evidence, such as the testimony of Mr. Donkin and the FPC statistics upon which he relied. A nonadjudicatory, nonrulemaking agency decision is subject to "thorough, probing, in-depth review," *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 415, 91 S.Ct. 814, 28

L.Ed.2d 136 (1971). Although review of deliberative memoranda reflecting an agency's mental process (such as the PDOD) is usually frowned upon, see *United States v. Morgan*, 313 U.S. 409, 422, 61 S.Ct. 999, 85 L.Ed. 1429 (1941); *Montrose Chemical Corp. v. Train*, 160 U.S.App.D.C. 270, 491 F.2d 63, 68 (1974), in the absence of formal administrative findings they may be considered by the court to determine the reasons for the decision-maker's choice. See *Overton Park*, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136; *Camp v. Pitts*, 411 U.S. 138, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973); *National Nutritional Foods Association v. Food & Drug Administration*, 491 F.2d 1141, 1145 (2d Cir.), *cert. den.*, 419 U.S. 874, 95 S.Ct. 135, 42 L.Ed.2d 113 (1974); *Bradley v. Weinberger*, 483 F.2d 410, 414 n.4 (1st Cir. 1973). Whatever may be the scope of immunity accorded to internal deliberative memoranda communicating views of agency personnel and summarizing information found elsewhere in the record, the PDOD here contained information germane to the decision and not duplicated elsewhere in the record.

As we stated in *Chelsea Neighborhood Associations v. United States Postal Service*, 516 F.2d 378, 386 (2d Cir. 1975), "NEPA, in effect, requires a broadly defined cost-benefit analysis of major federal activities." The guidelines of the Council on Environmental Quality, 40 C.F.R. § 1500.8(a)(8) provide that "agencies that prepare cost-benefit analyses of proposed actions should attach such analyses, or summaries thereof, to the environmental impact statement. . . ." Here the Bureau of Land Management included its cost-benefit analysis in the PDOD and attached it to the EIS as recommended by § 1500.8(a)(8). It was not, therefore, immune from NEPA review.

Nor was the court obligated to restrict its review to the administrative record. Although the focus of judicial inquiry in the ordinary suit challenging nonadjudicatory, nonrulemaking agency action is whether, *given the information available to the decision-maker at the time,* his decision was arbitrary or capricious, and for this purpose "the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court", *Camp v. Pitts*, 411 U.S. 138, 142, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973),[8] in NEPA cases, by contrast, a primary function of the court is to insure that the information available to the decision-maker includes an adequate discussion of environmental effects and alternatives, *Natural Resources Defense Council, Inc. v. Callaway*, 524 F.2d 79, 90–94 (2d Cir. 1975); *Greene County Planning Board v. FPC*, 455 F.2d 412, 419–20 (2d Cir. 1972), which can sometimes be determined only by looking outside the administrative record to see what the agency may have ignored.

A suit under NEPA challenges the adequacy of part of the administrative record itself—the EIS. Glaring sins of omission may be evident on the face of the statement, see, e.g., *Chelsea Neighborhood Associations v. United States Postal Service*, 516 F.2d 378 (2d Cir. 1975); *Silva v. Lynn*, 482 F.2d 1282, 1283 (1st Cir. 1973). Other defects may become apparent when the statement is compared with different parts of the administrative record.[9] See, e.g., *I–291 Why? Association v. Burns*, 372 F.Supp. 223 (D. Conn. 1974), *aff'd per curiam*, 517 F.2d 1077 (2d Cir. 1975). Generally, however, allegations that an EIS has neglected to mention a serious environmental consequence, failed adequately to discuss some reasonable alternative, or other-

---

**8.** *Compare Environmental Defense Fund, Inc. v. Ruckelshaus*, 142 U.S.App.D.C. 74, 439 F.2d 584, 595–96 (1971), *with Bradley v. Weinberger*, 483 F.2d 410, 413–15 (1st Cir. 1973), *and Proietti v. Levi*, 530 F.2d 836, 838 (9th Cir. 1976).

**9.** A district court should identify that evidence which it finds to be part of the administrative record, since the failure of an EIS to note prob-

lems or data elsewhere in the record may be probative of the extent to which the EIS has been compiled in objective good faith. What constitutes part of the administrative record may be very unclear in a NEPA case, where there is no formal factfinding process. At the very least, however, the record should include all relevant studies or data used or published by the agency compiling the statement.

wise swept "stubborn problems or serious criticism . . . under the rug," *Silva v. Lynn,* 482 F.2d at 1285, raise issues sufficiently important to permit the introduction of new evidence in the district court, including expert testimony with respect to technical matters, both in challenges to the sufficiency of an environmental impact statement [10] and in suits attacking an agency determination that no such statement is necessary.[11]

▮ Nor can we accept appellants' contention that plaintiffs' failure to present the evidence to the Department in the first instance for incorporation into the EIS [12] barred its consideration by the district court. To so hold would in effect shift the burden of insuring the adequacy of the EIS to environmental challengers, even though the primary and nondelegable responsibility for providing such an analysis lies with the agency. *Greene County Planning Board v. FPC,* 455 F.2d 412, 420 (2d Cir. 1972); *Calvert Cliffs' Coordinating Committee, Inc. v. United States Atomic Energy Commission,* 146 U.S.App.D.C. 33, 449 F.2d 1109, 1119 (1971). Here, moreover, much of the disputed information is contained in the PDOD, which was not circulated along with the draft EIS at all and was not made available to plaintiffs until they obtained it by court order after the final EIS had been published. For these reasons we conclude that, while the failure of the plaintiffs to offer such evidence to the Department when comments on the EIS were solicited might cast reflections upon the probative significance of the belatedly-offered evidence, the district court properly admitted the testimony of Mr. Donkin and the data on which it was based. The evidence introduced for the first time in the district court, however, would be probative only insofar as it tended to show either that the agency's research or analysis was clearly inadequate or that the agency improperly failed to set forth opposing views widely shared in the relevant scientific community.

▮ Applying these principles here, the evidence relied upon by the district court fell far short of demonstrating that the Department of Interior's cost-benefit comparison was unfounded or that it ignored any data. To begin with, the Donkin testimony consists primarily of opinions and estimates rather than hard facts. The opinions, moreover, were of necessity furnished without benefit of certain essential relevant facts as yet unknown (e.g., the existence, location, quantity and quality of oil and gas

---

10. *See, e.g., Natural Resources Defense Council, Inc. v. Callaway,* 389 F.Supp. 1263 *passim* (D. Conn. 1974), *rev'd,* 524 F.2d 79, 82, 94 n.14 (2d Cir. 1975); *Cape Henry Bird Club v. Laird,* 359 F.Supp. 404, 415–16 (W.D. Va. 1973), *aff'd* on opinion below, 484 F.2d 453 (4th Cir. 1973); *Sierra Club v. Lynn,* 502 F.2d 43, 51 (5th Cir. 1974), *cert. denied,* 421 U.S. 994, 95 S.Ct. 2001, 44 L.Ed.2d 484, 422 U.S. 1049, 95 S.Ct. 2668, 45 L.Ed.2d 701 (1975); *Natural Resources Defense Fund, Inc. v. TVA,* 367 F.Supp. 128, 133 (E.D. Tenn. 1973), *aff'd* on opinion below, 502 F.2d 852, 854 (6th Cir. 1974); *Environmental Defense Fund v. TVA,* 371 F.Supp. 1004, 1007–14 (E.D. Tenn. 1973), *aff'd* on opinion below, 492 F.2d 466, 468 (6th Cir. 1974); *Sierra Club v. Froehlke,* 534 F.2d 1289, 1291, 1295, 1303 (8th Cir. 1976); *Iowa Citizens for Environmental Quality, Inc. v. Volpe,* 487 F.2d 849, 850 (8th Cir. 1973); *Cady v. Morton,* 527 F.2d 786, 796 (9th Cir. 1975); *Friends of the Earth v. Coleman,* 513 F.2d 295, 300 & n.6 (9th Cir. 1975); *Trout Unlimited v. Norton,* 509 F.2d 1276, 1281, 1284 (9th Cir. 1974); *Life of the Land v. Brinegar,* 485 F.2d 460, 463, 469–73 (9th Cir. 1973), *cert. denied,* 416 U.S. 961, 94 S.Ct. 1979, 40 L.Ed.2d 312 (1974); *Sierra Club v. Stamm,* 507

F.2d 788, 789 (10th Cir. 1974); *Natural Resources Defense Council, Inc. v. Morton,* 148 U.S.App.D.C. 5, 458 F.2d 827, 830 (1972).

11. *See, e.g., Massachusetts Air Pollution & Noise Abatement Committee v. Brinegar,* 499 F.2d 125, 126 (1st Cir. 1974); *Conservation Society of Southern Vermont, Inc. v. Volpe,* 343 F.Supp. 761, 763 (D. Vt. 1972), *aff'd* 508 F.2d 927 (2d Cir. 1974), *vacated on other grounds,* 423 U.S. 809, 96 S.Ct. 19, 46 L.Ed.2d 29 (1975); *Rucker v. Willis,* 484 F.2d 158, 162 & n.6, 163 n.7 (4th Cir. 1973); *Nucleus of Chicago Homeowners Association v. Lynn,* 524 F.2d 225, 229, 231 (7th Cir. 1975), *cert. denied,* 424 U.S. 967, 96 S.Ct. 1462, 47 L.Ed.2d 734 (1976); *Minnesota Public Interest Research Group v. Butz,* 358 F.Supp. 584 *passim* (D. Minn. 1973), *aff'd* 498 F.2d 1314, 1322 (8th Cir. 1974) (en banc); *Fund for Animals v. Frizzel,* 174 U.S.App.D.C. 130, 530 F.2d 982, 987 & n.11 (1975).

12. Most comments received by the Department were reprinted verbatim in Volume III of the EIS.

in the leased tracts). The proof, therefore, calls for application of the principle that "appropriate allowance for the inexactness of all predictive ventures" must be made, see *Kleppe v. Sierra Club*, 427 U.S. 390, 402–03 n.14, 96 S.Ct. 2718, 2727, 49 L.Ed.2d 576 (1976).

In essence Mr. Donkin testified (1) on the basis of data from the FPC, Congressional hearings, and major oil companies, that the PDOD underestimated finding costs by as much as 168%, (2) on the basis of FPC statistics, that the PDOD and EIS underestimated per mile pipeline costs by 73%, (3) that, because of these errors in estimating finding and pipeline costs, the PDOD underestimated the total investment required, and (4) on the basis of industry statistics, that the PDOD overestimated peak production levels. However, the FPC data relied on by Donkin included items not necessarily classifiable as capital investment cost (e.g., exploratory overhead) and Donkin assumed that the Secretary's figures included such items as wages during pre-production activity whereas the EIS did not treat such items as capital investment costs. Thus the cost estimates relied upon by Donkin were not strictly comparable with those used by the Secretary. Moreover, the FPC statistics relating to pipeline costs involved a project to be constructed well after the time the EIS was drafted, which would require that due allowance be made for inflation in costs and revenues. Donkin admitted that in 1973 pipeline costs were only about $485,000 per mile, and testified that by October 1976 the costs had risen 150%, which would imply a figure of about $1,200,000. Although Donkin indicated that pipeline cost should be estimated at $1,750,000 per mile,[13] Mr. Brunjes, whose testimony Judge Weinstein credited "in full," testified that the Secretary of Interior's estimate of $1 million per mile was reasonable. Thus, when viewed against the uncertain

and changing nature of available estimates, the Department's estimate of $1 million per mile in late 1975 appears to have substantial evidentiary support and to be consistent with at least some of the evidence received by the district court.[14] Finally, Donkin's estimate of peak production was based on an assumed field life of 27.08 to 30 years. Since the Department assumed a shorter 25-year field life based on OCS experience (and there was no evidence that this assumption was unreasonable), it is not surprising that the Department's peak production figures were high, since it envisioned getting the same amount of oil and gas out of the ground over a shorter period of time.

In short, none of the statistics submitted by plaintiffs tended to demonstrate any fault in the Department's factual analysis or that the analysis was not conducted in good faith. In crediting Donkin's conclusions over those of the Department's experts, Judge Weinstein substituted the court's judgment for that of the Department and its experts, exceeding the proper scope of judicial review. The district court's finding that the Department's cost-benefit analysis was not compiled in good faith was thus clearly erroneous.

*Alternative of Separating Exploration of Tracts From Leasing For Oil and Gas Production.*

The district court concluded that the EIS failed to comply with NEPA because it gave "no consideration" or "failed to adequately consider" the alternative of separating exploration of the tracts from production so that the government, either alone or through a joint venture, could first determine whether there was oil or gas in the area and then offer the hydrocarbon-producing tracts for lease on terms that would provide greater government control

---

13. The $1,750,000 per mile figure, moreover, was based on a submission to the FPC of a pipeline between offshore areas within a field, whereas the EIS $1 million per mile figure was based on a field-to-shore pipeline.

14. Any such estimates of future pipeline costs must of necessity engage in various assumptions (which might be characterized as "crystal-balling") with respect to numerous variables (e.g., costs of on-site investigation, compliance with regulatory requirements, sea bottom conditions, terrain problems, etc.).

over environmental impacts. However, the PEIS does in fact discuss at some length possible types of separate exploration and production, including "Special Limited Leasing" in such pioneer areas as the mid-Atlantic Sale 40 tracts, "Leases for Exploration Only," "Federal Exploratory Drilling Program," "Federally Conducted Off-Structure Stratigraphic Drilling" and "Privately Conducted" off-structure drilling.

The "Alternatives" section of the EIS, moreover, reviews the possibility of government exploratory drilling prior to leasing, pointing out that, while this procedure would give the government detailed data upon which to base resource estimates and evaluate tracts before leasing, there would be a heavy strain on personnel, on procedures for contracting and hiring, and on the federal budget. It estimates that 60 or more exploratory wells might be required at a cost of $4 million to $7 million each, with the government taking the discovery risk, whereas leasing for exploration and sale would yield a substantial bonus to the government (over $1 billion). It also points out that no oil has yet been discovered in the Destin Dome, which was the subject of the government's MAFLA lease sale, for which it received $1 billion in advance bonus payment, thus confirming the precariousness of the government's entry into the exploration business.

In addition to consideration of the separate exploration alternative in the PEIS and EIS, the Department in March 1975 prepared for the Secretary's consideration a working paper, "Government Exploration of the OCS", and in June 1975 a "Position Paper on Separating of Decisions to Explore and to Develop OCS Area." These papers led to the Secretary's decision in August 1975 to amend OCS regulations to require a pause between exploration and development in order to provide coastal states with resulting data for use in considering development plans submitted by OCS lessees for approval.

■■■■ Although faced with this extensive consideration by the Secretary of separate exploration-production alternatives,

the district court nonetheless brushed the data aside as too brief, as "mere window dressing," and as offering reasons for rejection with which the court disagreed (e.g., that a federal exploration program would place too much risk on the federal government; that budgetary and manpower demands on the federal government would be too high; that such a leasing procedure would violate the Outer Continental Shelf Lands Act of 1953). This was clear error. Here again the district court appears to have misconceived its role and allowed its concept of the substantive merits of the issues to dominate its limited reviewing role, which is impermissible, see *Scenic Hudson Conference v. Federal Power Commission*, 453 F.2d 463, 468 (2d Cir. 1971), *cert. denied*, 407 U.S. 926, 92 S.Ct. 2453, 32 L.Ed.2d 813 (1972).

The grounds for the Secretary's rejection of the alternative of separate government exploration were well within the range of reasonableness, particularly since the adoption of this alternative, in addition to its other disadvantages, would require legislation by Congress to amend the OCS Lands Act, § 8(b) of which, 43 U.S.C. § 1337(b), mandates that the lessee be granted the right to explore for *and* produce any oil discovered in paying quantities. See *Gulf Oil Co. v. Morton*, 493 F.2d 141, 145 (9th Cir. 1973); *Union Oil Co. v. Morton*, 512 F.2d 743 (9th Cir. 1975). Although an alternative may not necessarily be exempt from EIS consideration merely because it cannot be put into effect without legislation, this factor weighs heavily against its being explored at length in view of the practical handicaps involved. See *NRDC v. Callaway*, 524 F.2d at 93.

Nor do we find any substantial support for the district court's decision in the testimony of Ms. Judith Gresham, an employee of the New York office of the Bureau of Land Management of Interior, upon which the court so heavily relied. She testified that during the period when Interior was selecting and identifying tracts to be offered as lease Sale 40, which was prior to Interior's making of the lease proposal and

its preparation of the EIS in connection with that proposal, the alternative of separation of exploration and production was not discussed by the New York office. Aside from the fact that consideration of such an alternative was not apparently part of her duties, it would in any event have been premature, since lease Sale 40 had not yet emerged as a proposal and no EIS had as yet been prepared in connection with lease Sale 40. It is elementary that the EIS, including its review of alternatives, need not be prepared and considered until the time when the agency publishes a proposal and holds hearings on the proposal. *Aberdeen & Rockfish Railroad Co. v. SCRAP (SCRAP II)*, 422 U.S. 289, 320, 95 S.Ct. 2336, 45 L.Ed.2d 191 (1975).

*The Possibility of Leasing Tracts Other Than Those Selected For Lease Sale 40.*

The district court further found the EIS inadequate for the reason that in considering the impact of tracts selected for lease Sale 40 the Secretary failed to consider the alternative of "excluding industry-preferred tracts, or including less highly desired tracts in the final sale offer because of related onshore impacts and developments." The district court reasoned that if a tract believed less likely to have hydrocarbons in it than those selected were located "contiguous to potentially acceptable pipeline landfalls" (which erroneously assumes that such corridors of landfalls have been determined), the Secretary had a duty to consider selecting such a tract in lieu of others selected for lease.

The criticism ignores the logical procedure which was followed by the Department of Interior. In deciding what publicly-owned areas should be made available for oil and gas exploration the first step taken by the Department was to identify those sites which were reasonably believed on the basis of geological and other data to have a potential hydrocarbon content. It then sought to find out whether qualified lessees might be willing to explore any of them by asking for tract nominations. Then, armed with knowledge of what was within the realm of the possible, the Department examined the 557 tracts nominated by private industry for possible lease and, after considering some sixteen environmental criteria, eliminated all but 154 tracts, which became the subject of the Sale 40 proposal and of the EIS then prepared. In addition to considering the onshore impact of these tracts, the EIS dealt at length with the alternative of deleting still more tracts from the proposal or "substituting tracts within the call for nominations," so that the leased area would be smaller or in a somewhat different location in the mid-Atlantic.

In our view this procedure was reasonable and gave proper consideration to alternatives of the type suggested by the district court. Moreover, it is significant that, although the states and localities that might be most affected onshore by the proposal offered various comments with respect to it, none suggested that other tracts should have been substituted for those offered, much less that tracts should have been selected initially on the basis of possible onshore environmental impacts rather than potential hydrocarbon content. The district court's criticism in this regard appears to be unrealistic since, as actual experience in the tract selection process demonstrates, it ignores the strong probability that nobody would have bid on less desirable tracts if they had been substituted. Indeed, as it was, bids were submitted on only 101 of the 154 tracts offered by the Department for lease and the Department accepted bids on 93 of the 101 tracts. The evidence was clear, as Ms. Gresham testified, that there was a "nonexistent" interest in leasing tracts of the type suggested *sua sponte* by the district court because there was an insufficient indication of the existence of hydrocarbons in those tracts.

*The Claims of Lack of Good Faith on the Part of the Secretary of Interior*

In August, 1976, at the conclusion of the hearing on plaintiff's application for preliminary injunctive relief, the district court found, in response to claims of bad faith on the part of the Secretary, that "on balance,

the court has not been convinced that the Secretary and his subordinates did not attempt to execute NEPA honestly." (Memo. opin. pp. 32–33, 8/13/76). Following our reversal of preliminary relief, no substantial additional evidence was introduced on the subject of the Secretary's good faith. Indeed, that matter was not listed by the trial judge among the issues to be discussed in post-trial briefs. Nevertheless, the court's final opinion concludes that there was persuasive evidence that the Secretary's decision to proceed with Sale 40 was made "long before the ostensible decision dates, and before fulfillment of NEPA's requirements, and that the Bureau of Land Management simply went through the NEPA motions in order to validate the decisions previously made," and "that the Department of Interior had little interest in properly fulfilling its obligations under NEPA." These statements were presumably based on the same evidence the court had examined before its original contrary finding in which it concluded:

> It must be recognized that both the accelerated program and Sale No. 40 involve significant political considerations of widespread interest. As a result, it is not realistic to assume that discussion and debate among high public officials and decisionmakers will not take place prior to a final decision. The fact that this dialogue precedes the decision and was engaged in by the eventual decisionmaker does not, as plaintiffs assert, indicate that the Secretary cannot consider the environmental data presented him with good faith objectivity.

The only additional evidence bearing on the Secretary's good faith offered at trial was the testimony of one witness that he had been advised in 1965 by the "people" in the Department of Interior that they were "planning on about a 1970 sale in the Atlantic." However, this conversation, which occurred four years before NEPA was passed, was hardly probative on the question of compliance. The district court's about-face on this issue was not its only change made without any new evidentiary support. With respect to the EIS in general it originally concluded:

But, on balance, the impartial reader of the EIS is driven to the conclusion that, within the limit of reasonable researchers and writers, a studied effort was made to present a fairly grim picture of possible environmental difficulties. If anything, the studies are almost too detailed and encyclopedic for a lay executive to fully comprehend. The Final EIS Sale No. 40, together with the PDOD prepared by staff to summarize and clarify the issue for decision, satisfactorily meets both the spirit and the letter of NEPA requirements in all respects except one, addressed below.

Although the district court based its decision on grounds other than bad faith, we nevertheless feel compelled to advert to this unfortunate discussion, not only because of the possibility that the court might otherwise be inclined to resurrect it but because of the needless damage it inflicts on government servants. As it is, a government policymaker is placed by NEPA in a difficult enough posture with respect to controversial federal programs of the type under review. On the one hand, in response to public pressure to find means of satisfying our ever-increasing and widespread national energy needs, he is expected to originate and consider proposals for exploitation of our natural resources. On the other, he is obligated by NEPA to proceed with such proposals only when, in his honest judgment and after full detailed study and balancing of all relevant factors, he concludes that the project is worth the environmental cost. Although the task might be lightened by placing the burden of making the final decision elsewhere—such a procedure conceivably could lead to more objective resolution of the conflict, see Note, *The Least Adverse Alternative Approach to Substantive Review under NEPA*, 88 Harv.L.Rev. 735, 737, 739–40 (1975)—under present law it continues to rest on the same person's shoulders, undoubtedly in part because he and his subordinates are more familiar with all of the relevant facts and circumstances than anyone else in government.

There is always the risk that a government official who originates a project may be too partial toward it to be completely objective in weighing environmental objections to it. However, to suggest that because he originated it before exposing it to NEPA review the latter was a "charade" and the outcome a "foregone conclusion" is not only unnecessary but does a disservice in the absence of supporting proof. Here we fail to find such proof. The various statements of federal officials from the President on down taken out of context by the district court, in which they emphasize the importance of going forward with leasing of the OCS for oil and gas exploration, were made on the understanding that the proposal was subject to thorough environmental analysis and compliance with NEPA. As the EIS states—(Vol. I, p. 34) with reference to the OCS planning schedule first proposed in November, 1974, and modified in 1975:

> This proposed OCS planning schedule does not represent a decision to lease in any of these particular areas. It represents only the Department's intent to consider leasing in such areas and to proceed with the leasing development of such areas if it should be determined that

leasing and development in such areas would be environmentally, technically, and economically acceptable.

CONCLUSION:

The district court appears to have allowed its views regarding the substance of the Secretary's proposal to becloud its understanding of its reviewing function and its analysis of the Sale 40 EIS for adequacy, leading to the court's unfortunate characterization of the Secretary's motives, its substitution of testimony received by it for that considered by the Secretary, and its adoption *sua sponte* of grounds for inadequacy that were not suggested by the parties. Were the major federal action at issue one that irrevocably committed specific public resources to irreversible damage from the outset, see e. g., *NRDC v. Callaway*, 524 F.2d 79 (2nd Cir. 1975) (ocean dumping site), rather than one subject to substantial modification by the government to satisfy environmental objections as it progresses we, like the district court, might be troubled by the apparent failure of the EIS, despite its length, to deal as thoroughly with some environmental consequences of transportation as might be hoped.[15]

**15.** The following are a few examples of questions raised by the EIS:

(1) In assessing the risk of oil spills at drilling sites and through pipeline accidents the EIS relies almost entirely on spill data from Gulf of Mexico offshore operations, which are represented to provide the most complete tabulation of information on the subject. However, the EIS, unlike the PEIS, fails to take into account the probability that in the pioneer mid-Atlantic area greater spill risks are presented because of heavier weather and rougher seas (witness the recent North Sea blow-out). In contrast to the EIS, the PEIS multiplied the Gulf of Mexico statistics by a risk factor in order to account for the added risk faced in the Atlantic. Moreover, in discussing blow-outs the EIS, using statistics dating back to 1970, does not include the Santa Barbara disaster, which occurred in 1969.

(2) Models for determining the possible impact of spills were apparently limited to tests made on the basis of surface currents without considering bottom currents and the risk that they would lead to heavy onshore tar residue deposits.

(3) A key chart in the EIS (Table III–23, Vol. II, page 91) estimates that there is only a 39% chance that during the 25-year life of the Sale 40 operations one spill of greater than 1,000 barrels will go ashore and a 90% chance that one spill of 50 to 1,000 barrels will go ashore. However, the percentages are based on a study of oil spill trajectories originating at the drill sites 45 to 100 miles offshore, whereas available data indicates that 67.62% of all oil spilled in the Gulf of Mexico since 1967 has come from pipelines, which are located nearer to shore than the drilling sites. Moreover, other oil spills occur closer to shore as the result of tanker accidents and the like.

(4) Although the EIS assumes that the pipelines will be buried it fails to discuss, in using Gulf of Mexico data, (1) whether the pipelines there are also buried, (2) whether ocean "scour" in the mid-Atlantic would expose buried pipelines in some areas, and (3) whether it may be impossible to bury pipelines in other large areas of the ocean bottom, such as the gravel area off Monmouth County. Accepting the fact that 92.31% of all pipeline accidents are caused by ships

Since our questions pertain to the transportation stage and the multistage project is environmentally divisible, we place them in the same category as those of concern to the district court. We are satisfied that the Department of Interior, which will have continuous control over the venture, will deal with them thoroughly in the Development Plan EIS before approving any plans for transportation of such oil as may be discovered in the Sale 40 area and after the Department has the essential information regarding the location, quantity and quality of any discovered oil, an ocean bottom survey, and the Coastal Zone Management Act programs that will have been enacted.

The decision of the district court is reversed, the injunction is vacated and the cases are remanded with direction to dismiss the consolidated complaints.

---

dragging anchors across the pipelines, the EIS fails to compare shipping and particularly fishing trawler traffic in the mid-Atlantic with the Gulf, thus putting into question the applicability of the Gulf statistics to the mid-Atlantic area.

(5) No effort appears to be made to furnish statistics as to the present tanker spillage in the area offshore that could possibly be used to transport oil from the mid-Atlantic to onshore refineries if pipelining became unfeasible, much less to explain whether tankwashing (which accounts for 85% of present worldwide tanker spillage) and bilge bunkering would occur in the area between the Sale 40 field and shore. Worldwide tanker spill statistics, although stated, are deemed inapplicable without explanation. The probable consequences of using smaller tankers in lieu of the larger international types are not explained.