CITIZENS FOR BALANCED ENVIRON-
MENT AND TRANSPORTATION,
INC., et al, Plaintiffs,

v.

SECRETARY OF TRANSPORTATION
et al, Defendants.

Civ. No. 15054.

United States District Court,
D. Connecticut.

July 18, 1980.

Haynes N. Johnson, Bryan, Parmelee, Johnson & Bollinger, Stamford, Conn., Harvey D. Carter, Jr., Bennington, Vt., Gregory I. McGregor, Boston, Mass., for plaintiffs.

Francis J. Collins, Cutsumpas, Collins & Hannafin, Danbury, Conn., for amicus curiae Brookfield Planning Commission.

Scott Warner, Salisbury, Conn., for amicus curiae Housatonic Valley Association.

William Lynch, Conn. Dept. of Transportation, Wethersfield, Conn., Richard Blumenthal, U.S. Atty., Diana Garfield, Asst. U.S. Atty., New Haven, Conn., for Volpe and Siccardi.

Alfred F. Wechsler, Richard Goodman, Hartford, Conn., for A. Earl Wood and George S. Koch.

Carl R. Ajello, Atty. Gen., F. D. Neusner, Kenneth N. Tedford, Asst. Attys. Gen., Hartford, Conn., for Conn. Commissioner of Transportation and Connecticut Deputy Commissioner of Transportation, Bureau of Highways.

Gary A. MacMillan, Francis J. McNamara, Jr., Cummings & Lockwood, Stamford, Conn., for General Datacomm Industries, Inc., The Gilbert & Bennett Mfg. Co., The Perkin-Elmer Corp., The Holson Co., Richardson-Merrell, Inc., First Merritt Corp., Emery Air Freight Corp., Pitney Bowes, Inc. and Boehringer-Ingelheim Ltd.

William B. Fitzgerald, Carmody & Torrance, Waterbury, Conn., in lieu of Walter F. Torrance for the Connecticut Light & Power Co.

Stephen J. O'Brien, Fairfield, Conn., for The J. Alden Weir Farm Committee for Heritage Conservation, Inc.

### RULING ON MOTION TO VACATE PERMANENT INJUNCTION

DALY, District Judge.

Plaintiff (CBET) is the successor in interest of the Committee to Stop Route 7, aggrieved by the planned construction of a

new expressway to replace the present U.S. Route 7 from Norwalk, Connecticut to Danbury, Connecticut.[1] Its original complaint, filed in 1972, seeks to block the construction of the proposed expressway for failure to prepare an environmental impact statement (EIS) as required by the National Environmental Policy Act of 1969 (NEPA), 83 Stat. 852, 42 U.S.C. § 4321 et seq. The essence of plaintiff's complaint focuses on the need to comply with § 102(2)(C) of NEPA, 42 U.S.C. § 4332(2)(C).[2]

On July 17, 1972 Judgment entered for the plaintiff enjoining defendants[3] "from taking any steps to construct any portion of relocated Route 7 until ... [an EIS] has been prepared according to the provisions of § 102(2)(c) of [NEPA]."[4] 346 F.Supp. at 742. The defendants have filed a copy of the final EIS[5] prepared for the proposed expressway extending from Norwalk to Danbury and approved by the director of the Office of Environment and Design of

---

1. FEIS Volume 1—Narrative at f. When plaintiffs' predecessor brought its original action for declaratory and injunctive relief in 1972 the construction project contemplated extending to New Milford, Connecticut. *Committee to Stop Route 7 v. Volpe*, 346 F.Supp. 731, 733 (D.Conn.1972).

2. § 102(2)(C) of NEPA, 42 U.S.C. § 4332(2)(C) provides:

    (2) all agencies of the Federal Government shall—
    (C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—
    (i) the environmental impact of the proposed action,
    (ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,
    (iii) alternatives to the proposed action,
    (iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and
    (v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.
    Prior to making any detailed statement, the responsible Federal official shall consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved. Copies of such statement and the comments and views of the appropriate Federal, State, and local agencies, which are authorized to develop and enforce environmental standards, shall be made available to the President, the Council on Environmental Quality and to the public as provided by section 552 of Title 5, and shall accompany the proposal through the existing agency review processes
    . . . .

3. The original named defendants are the U.S. Secretary of Transportation, the Connecticut Commissioner of Transportation, his Deputy

Commissioner in charge of the Connecticut Bureau of Highways, the Division Engineer for Connecticut and the Federal Highway Administration. The defendants have been sued in their official capacity and pursuant to Rule 25(d)(2) Fed.R.Civ.P. the official title rather than the individual name is being used to designate the defendants. The following parties have been allowed to intervene as defendants: General Datacomm Industries, Inc., the Gilbert & Bennett Mfg. Company, the Perkin-Elmer Corporation, the Holson Company, Richardson-Merrell, Inc., First Merritt 7 Corporation, Emery Air Freight Corporation, Pitney Bowes, Inc., and Boehringer-Ingelheim Ltd.

4. Judgment entered pursuant to Judge Newman's decision of July 7, 1972. The state defendants subsequently sought to amend that judgment through a ruling that if only state funds were used for the construction project no EIS would be required. Judge Newman denied the motion on September 5, 1972. A second phase of this litigation considered the necessity of an EIS for that portion of the proposed expressway extending from Danbury, Connecticut to New Milford, Connecticut. 376 F.Supp. 806 (D.Conn.), *affirmed*, 503 F.2d 601, *cert. denied*, 423 U.S. 870, 96 S.Ct. 135, 46 L.Ed.2d 100 (1975). Only the first phase of this litigation, requiring the preparation of an EIS for that portion of the proposed expressway extending from Norwalk to Danbury, is being considered here.

    The Hon. Jon O. Newman was recently appointed to the Second Circuit Court of Appeals. The case was reassigned to this Judge on April 18, 1979.

5. The FEIS is comprised of three volumes. Volume 1–Narrative, responds to comments and questions received in response to the circulation of the Draft EIS/4(f) statement. Volume 2–Comments, is comprised of two volumes and contains additional comments and questions and corrections to the original Draft EIS/4(f) statement found in Volume 3—Draft EIS/4(f)—as published.

the Federal Highway Administration [FHWA].[6]

By motion filed March 30, 1979 the defendant-intervenors seek to vacate the injunction entered by Judge Newman in 1972. The defendants claim that the EIS submitted to this Court satisfies both Judge Newman's order and the requirements of NEPA. Plaintiff's response of May 3, 1979 outlines its objections to lifting the stay. The plaintiffs claim that the FEIS is inadequate, in that it fails to reflect "a comprehensive, good-faith study of all relevant environmental concerns as required by NEPA." (Brief for plaintiff at 2, May 3, 1979.) The plaintiffs' objections may be categorized into four general areas: (1) transportation planning; (2) traffic engineering; (3) air quality analysis; and (4) consideration of alternatives.[7]

This opinion addresses plaintiff's objections only so far as they challenge the defendants' compliance with the procedural requirements of NEPA.

**6.** The DEIS was submitted to the FHWA by the Connecticut Department of Transportation (CDOT) on January 1, 1974 and approved by the FHWA on January 23, 1974. The final EIS was submitted to the FHWA on May 24, 1977 and approved by the FHWA on August 14, 1978 subject to the condition that construction not commence until the Connecticut Department of Environmental Protection grants an Indirect Source Permit under State Regulation 19–508–100 pursuant to the conditions of the State Implementation plan, as provided by 23 CFR 770.205(b)(6). Affidavit of John H. Gastler, Supervisor of the Air Quality Unit of the Connecticut Department of Transportation, January 20, 1979 ¶¶ 13, 17.

**7.** Plaintiffs' amended complaint, filed with this Court on May 2, 1979, alleges defendants' breach of five federal statutes: the National Environmental Policy Act of 1969, as amended, 83 Stat. 852, 42 U.S.C. § 4321 et seq.; the Clean Air Act, as amended, 91 Stat. 685, 42 U.S.C. § 7401 et seq.; the Intergovernmental Cooperation Act, as amended, 82 Stat. 1098, 42 U.S.C. § 4201 et seq.; the Federal-Aid Highway Act, as amended, 80 Stat. 735, 23 U.S.C. § 101 et seq.; and section 4(f) of the Department of Transportation Act, as amended, 80 Stat. 931, 49 U.S.C. § 1653(f).

## BACKGROUND

In 1957, the Connecticut Legislature provided official impetus for the construction of a new north-south expressway to replace U.S. Route 7 from Norwalk to New Milford.[8] Between 1957 and 1962 the Connecticut Department of Transportation (CDOT) (then the Connecticut Highway Department) investigated possible routes for the new expressway. Public hearings were held in Norwalk in 1961, in Wilton in 1964 and in the towns of Ridgefield, Redding and Danbury in 1965.

The proposed project covers approximately twenty miles, passing through the towns mentioned above and ending in the vicinity of Interstate 84 in Danbury, which has been open to traffic for several years. The state and federal government will share the cost of the proposed design alternative, estimated to be 186 million dollars.[9] Survey and design work for the northern portion of Route 7 commenced after the General Assembly authorized the necessary funding in 1965. In 1967 construction began and a one and one half mile segment running from

**8.** The General Assembly of the State of Connecticut first authorized Relocated Route 7, by adopting Special Act 399 which was approved on May 28, 1957. Further legislation authorized additional activity between 1961 and 1976. *See* 1961 P.A. 605; 1965 P.A. 325; 1973 P.A. 73–157; 1976 P.S. 76–332. Affidavit of James F. Shugrue, Commissioner of Transportation for the State of Connecticut 1976–1979, February 23, 1979 ¶¶ 7–8.

The EIS only covers the expressway to Danbury. *See* note 1, *supra.* Judge Newman's decision required that a minimum amount of the expressway subject to an EIS to be from Norwalk to Danbury. 346 F.Supp. at 740.

**9.** Volume 3—Draft EIS/4(f)—As published at 128

"The total cost of engineering, acquisition of right-of-way and construction is estimated for as Designed Alternate—186 million dollars, for Alternate 1—218 million dollars, for Alternate 2—201 million dollars, and for the widening of existing Route 7—60 million dollars." Because the composition of the highway would differ with each alternative, the authors of the EIS caution against using the figures for comparative purposes.

The 1978 revised cost of the "As Designed Alternate" is $210,525,000. Affidavit of James F. Shugrue, note 8, *supra*, ¶ 27.

Interstate 95 to New Canaan Avenue in Norwalk was completed in 1971.

Pursuant to Policy and Procedure Memorandum 20–8, issued by the FHWA, Public Design hearings were held in 1969 and 1970. After it was announced that construction was to proceed in the Wilton area the instant suit was filed.

Following Judge Newman's decision in 1972 the CDOT Commissioner and the FHWA Division Administrator initiated action to obtain funding for the preparation of the EIS. Approval was given on August 16, 1972 and Project Number F–30(15) assigned.

Social, environmental and economic information, *inter alia*, was gathered by CDOT in 1972 and 1973 for the Draft EIS/4(f) (DEIS).[10] New studies as well as compilation and analysis of independent projects already completed or proceeding were included. The DEIS was completed in January of 1974 and made available to the appropriate governmental agencies and the public for comment in February of 1974.[11] After an appropriate comment period[12] a Final EIS/4(f) (FEIS) was prepared.[13]

The FEIS, designated FHWA–CONN–EIS–74–01–F, incorporates all the responses and comments to the DEIS into twenty-four subject areas. The CDOT and the Connecticut Division of the FHWA gave their respective approval to the FEIS on May 24 and May 26, 1977.[14] The FEIS was then reviewed by the regional and Wash-

ington offices of the FHWA and, then Secretary of Transportation, Brock Adams. The FHWA gave final approval of the FEIS on August 14, 1978; note 6, *supra*. Notice of the publication and approval of the FEIS was made on August 28, 1978 in the Federal Register and August 29, 1978 in local papers. Respective thirty day response periods permitted comments from governmental agencies and the public.[15]

Before considering plaintiff's broad-based allegations of defendants' non-compliance with NEPA, an understanding of this Court's scope of review is essential.

## JUDICIAL REVIEW UNDER NEPA

The court's role in overseeing compliance with NEPA is to determine first, whether the agency has substantially complied with the procedural mandate of the statute; and second, has the agency, in satisfying that mandate, undertaken a comprehensive, good-faith consideration of the consequences of its action. The Supreme Court emphasizes the essentially procedural duties of an agency: "NEPA does set forth significant substantive goals for the Nation, but its mandate to the agencies is essentially procedural." *Vermont Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978). If the decision of the agency is made in good-faith, after a "fully informed and well considered" judgment, a reviewing court has no power to set it aside. The only role of a reviewing court, in fact, is to insure that

---

**10.** A Draft EIS is defined as "a document which contains an assessment of the significant effects a major action will have upon the quality of the human environment." 23 C.F.R. § 771.3(i) (1979).

**11.** 23 C.F.R. §§ 771.12 and 771.13 (1979).

**12.** 23 C.F.R. § 771–12(f) (1979) provides for a minimum forty-five day comment period. According to the affidavit of Donato J. Altobelli, Division Administrator for the Connecticut Division of the FHWA, January 31, 1979 ¶ 56, an *eighteen month comment period was allowed* during which approximately 1240 pages of commentary from governmental agencies and public groups were received. *But see* Affidavit of James F. Shugrue note 8, *supra*, ¶ 17. (Comment period was sixty days.)

**13.** A Final EIS is defined as a "detailed statement on a major action which significantly affects the quality of the human environment ... [containing] the same supporting information required in the draft EIS with appropriate revisions to reflect comments received from circulation of the draft EIS and the public hearing process." 23 C.F.R. § 771.2(j) (1979).

**14.** Affidavit of James F. Shugrue, note 8, *supra*, ¶ 22.

**15.** Affidavit of Donato J. Altobelli, Division Administrator for the Connecticut Division of the FHWA, January 31, 1979 ¶ 77.

"once an agency has made a decision subject to NEPA's procedural requirements, ... the agency has considered the environmental consequences; it cannot 'interject itself within the area of discretion of the executive as to the choice of the action to be taken.'" *Strycker's Bay Neighborhood Council v. Karlen*, 444 U.S. 223, 228, 100 S.Ct. 497, 500, 62 L.Ed.2d 433 (S.Ct.1980), quoting, *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n.21, 96 S.Ct. at 2730 n.21 (1976).[16] While such a standard may appear to be an abdication of responsibility, it takes into account the realization that issues requiring a high level of technical expertise must "properly be left to the informed discretion of the responsible federal agencies. [Citation omitted.] Absent a showing of arbitrary action, ... [the courts] must assume that the agencies have exercised this discre-

tion appropriately." *Kleppe v. Sierra Club*, *supra*, at 412, 96 S.Ct. at 2731.

A host of Second Circuit decisions, which address themselves to the reviewing court's role, parallel these most recent Supreme Court pronouncements.[17] The most comprehensive synthesis is Judge Mansfield's decision in *County of Suffolk v. Secretary of Interior*, 562 F.2d 1368 (2d Cir.), *cert. denied*, 434 U.S. 1064, 98 S.Ct. 1238, 55 L.Ed.2d 764 (1978).

The district court does not sit as a super-agency empowered to substitute its scientific expertise or testimony presented to it *de novo* for the evidence received and considered by the agency which prepared the EIS. [Citation omitted.] The court's task is merely 'to determine whether the EIS was compiled in objective good faith and whether the resulting statement would permit a decision maker to fully

---

**16.** Justice Marshall's dissent interprets the majority's ruling as relegating "the reviewing court to the essentially mindless task of determining whether an agency 'considered' environmental factors even if that agency may have effectively decided to ignore those factors in reaching its decision." *Strycker's Bay, supra*, 444 U.S. at 231, 100 S.Ct. at 501–02 (Marshall, J., dissenting). This Court does not subscribe to Justice Marshall's interpretation. The language of the majority parallels that used by the Court in *Vermont Yankee v. NRDC*, 435 U.S. 519, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978); *New York v. Kleppe*, 429 U.S. 1307, 97 S.Ct. 4, 50 L.Ed.2d 38 (1976) and *Kleppe v. Sierra Club*, 427 U.S. 390, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976). As stated by the Court in *Vermont Yankee*, NEPA was designed "to insure a fully-informed and well considered decision, ...." 435 U.S. at 558, 98 S.Ct. at 1219. Ignoring environmental factors would not comport with NEPA's mandate.

The language used in *Kleppe v. Sierra Club, supra*, requiring the reviewing court to insure that the agency "has taken a ·'hard look' at environmental consequences," 427 U.S. at 410, n.21, 96 S.Ct. at 2730, n.21, is not incongruous with the decision in *Strycker's Bay*. What the Court held was that a reviewing court cannot order an agency "to elevate environmental concerns over other, admittedly legitimate, considerations." *Strycker's Bay, supra*, 444 U.S. at 228, 100 S.Ct. at 500. It still remains the law, as this Court views it, that "[a]dministrative decisions should be set aside, in this context, as in every other, only for substantial procedural or substantive reasons as mandated by statute," 435 U.S. at 558, 98 S.Ct. at 1219, or if the agency's decision is found to be "arbitrary,

capricious, an abuse of discretion or otherwise not in accordance with law," 5 U.S.C. § 706 (2)(A). *See Benmar Transport & Leasing Corp. et al v. ICC et al*, 623 F.2d 740, 743 slip. op. 3461, 3467 (2d Cir. 1980).

In restating the essentially procedural duties of the agency and the scope of review by the courts, the Supreme Court may be attempting to articulate a certain reality and concomitant frustration faced by a judicial body called upon to resolve issues requiring a technical expertise not normally possessed by the judicial reviewer. An analogous concern has been expressed in regard to desegregation problems. *See Estes v. Metropolitan Branch, Dallas NAACP*, 444 U.S. 437, 451, n.18, 100 S.Ct. 716, 723, n.18, 62 L.Ed.2d 626 (Powell, J., dissenting) (S.Ct.1980).

**17.** *See Monroe County Conservation Council v. Adams*, 566 F.2d 419 (2d Cir.), *cert. denied*, 435 U.S. 1006, 98 S.Ct. 1876, 56 L.Ed.2d 388 (1978); *County of Suffolk v. Secretary of Interior*, 562 F.2d 1368 (2d Cir.), *cert. denied*, 434 U.S. 1064, 98 S.Ct. 1238, 55 L.Ed.2d 764 (1978); *Natural Resources Defense Council, Inc. v. Callaway*, 524 F.2d 79 (2d Cir. 1975); *Chelsea Neighborhood Assns. v. U. S. Postal Service*, 516 F.2d 378 (2d Cir. 1975); *Greene County Planning Board v. FPC*, 455 F.2d 412 (2d Cir.), *cert. denied*, 409 U.S. 849, 93 S.Ct. 56, 34 L.Ed.2d 90 (1972); *Scenic Hudson Conference v. FPC*, 453 F.2d 463 (2d Cir.), *cert. denied*, 407 U.S. 926, 92 S.Ct. 2453, 32 L.Ed.2d 813 (1972); *Monroe County Conservation Council, Inc. v. Volpe*, 472 F.2d 693 (2d Cir. 1972). *Scenic Hudson Preservation Conference v. FPC*, 453 F.2d 463 (2d Cir.), *cert. denied*, 407 U.S. 926, 92 S.Ct. 2453, 32 L.Ed.2d 813 (1972).

consider and balance the environmental factors.' [Citation omitted.] 'The court is not empowered to substitute its judgment for that of the agency.' [Citations omitted.] This is particularly true when it comes to evaluating the factual conclusions of the EIS. If the agency's conclusions have a 'substantial basis in fact,' [citation omitted], and if the EIS has set forth responsible opposing scientific views, [citation omitted], it is not for the district court to resolve conflicting scientific options. Evidence-weighing must be left to the agency making the policy decision. [Citation omitted.]

562 F.2d at 1383. Tempering this review a court is to be

> governed by the "rule of reason," under which an EIS need not be exhaustive to the point of discussing all possible details bearing on the proposed action but will be upheld as adequate if it has been compiled in good faith and sets forth sufficient information to enable the decision-maker to consider fully the environmental factors involved and to make a reasoned decision after balancing the risks of harm to the environment against the benefits to be derived from the proposed

action, as well as to make a reasoned choice between alternatives. [Citations omitted.]

562 F.2d at 1375.

A reviewing court's task is neither "mindless" nor is it relegated to serving as a rubber-stamp to agency action in the name of separation of powers. Where, for example, it is shown that the FHWA failed to make an objective detailed review of the DEIS and relied solely on statements from state agencies prior to approving the FEIS there would be a clear abdication of a "primary and nondelegable responsibility" of the FHWA in violation of NEPA.[18] This type of procedural irresponsibility would compel a court to reject the EIS, not only because a technical violation of NEPA has occurred, but more importantly, because dispensing with the mechanics Congress established in this area seriously jeopardizes the very balance NEPA seeks to guarantee between technological progress and environmental quality. Whether such a procedural irregularity will cause this Court to reject the EIS, or the decision of the responsible agency "displays such a callous disregard of the environmental considerations expressed in the EIS as to support an

---

18. § 102(2)(D) of NEPA, 42 U.S.C. § 4332(2)(D) provides:

(D) Any detailed statement required under subparagraph (C) after January 1, 1970, for any major Federal action funded under a program of grants to States shall not be deemed to be legally insufficient solely by reason of having been prepared by a State agency or official, if:
(i) The State agency or official has statewide jurisdiction and has the responsibility for such action,
(ii) the responsible Federal official furnishes guidance and participates in such preparation,
(iii) the responsible Federal official independently evaluates such statement prior to its approval and adoption, and
(iv) after January 1, 1976, the responsible Federal official provides early notification to, and solicits the views of, any other State or any Federal land management entity of any action or any alternative thereto which may have significant impacts upon such State or affected Federal land management entity and, if there is disagreement on such impacts, prepares a written assessment of such impacts and views for incorporation into such detailed statement.

The procedures in this subparagraph shall not relieve the Federal official of his responsibilities for the scope, objectivity, and content of the entire statement or of any other responsibility under this chapter; and further, this subparagraph does not affect the legal sufficiency of statements prepared by State agencies with less than statewide jurisdiction. [Footnote omitted.]

The enactment of subsection (D) was in response to this Circuit's more demanding standard articulated in *Conservation Society of Southern Vermont, Inc. v. Secretary of Transportation*, 508 F.2d 927, 931–933 (2d Cir. 1974), *vacated and remanded*, 423 U.S. 809, 96 S.Ct. 19, 46 L.Ed.2d 29 (1975), *reversed on remand*, 531 F.2d 637 (2d Cir. 1976), [1975] U.S.Code Cong. & Ad.News 859, 1797.

If a reviewing court were to find that the FHWA had failed to properly comply with the procedural mandate imposed by NEPA it would then be in a position to reject the FEIS, thereby continuing an existing injunction, as in this case, or imposing one in the first instance. *See e. g., I–291 Why? Association v. Burns*, 372 F.Supp. 223, 245–246 (D.Conn.1974), *affirmed*, 517 F.2d 1077 (2d Cir. 1975).

inference of bad faith on the part of the agency in deciding nonetheless to proceed with the project", *I–291 Why? Association v. Burns*, 372 F.Supp. 223, 242 (D.Conn. 1974), *affirmed*, 517 F.2d 1077 (2d Cir. 1975), is a question of fact to be determined on a case-by-case basis.[19]  With this standard of review in mind the Court considers CBET's objections to the EIS.[20]

## ALTERNATIVES

■  CBET claims that the EIS inadequately considered alternatives to construction of a new expressway.  NEPA requires "a detailed statement by the responsible official on . . . alternatives to the proposed action."  42 U.S.C. § 4332(2)(C)(iii).  In *Vermont Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978), the Court held that satisfaction of NEPA's "detailed statement . . . [of] alternatives":

> cannot be found wanting simply because the agency failed to include every alternative device and thought conceivable by the mind of man.  Time and resources are simply too limited to hold that an impact statement fails because the agency failed to ferret out every possible alternative, regardless of how uncommon or unknown that alternative may have been at the time the project was approved.  *Id.*, at 551, 98 S.Ct. at 1215.

Alternatives that promise only remote or speculative possibilities because of their obvious inability to alleviate the problems for which the project is being proposed should equally not cause a court to hold that the EIS fails.  *See Monroe County Conservation Council v. Adams*, 566 F.2d 419 (2d Cir. 1977), *cert. denied*, 435 U.S. 1006, 98 S.Ct. 1876, 56 L.Ed.2d 388 (1978).

Four alternatives were investigated by the Highway Department to determine how to best alleviate present traffic problems and satisfy future needs:

(1) Do nothing alternative-leave the existing Route 7 as a two-lane highway; (2) Widening Alternative-widen existing Route 7 to a four-lane undivided highway with no control of access; (3) Mass transit that would meet the needs of the communities involved and eliminate the need for a relocation or widening; (4) Relocation Alternative-provide a new highway on new location—Under the relocation Alternative three different corridor locations were considered, referred to as the As Designed Alternate, Alternate 1 and Alternate 2.

Volume 3-Draft EIS/4(f)—As Published (3–DEIS) at 25.

### Do Nothing

After analyzing studies of traffic congestion, accident rates, noise levels and air quality, the EIS concludes that the "Do Nothing" Alternative would only exacerbate these problems already seriously impairing the viability of the existing highway.  *See* 3–DEIS at xi, 25–28.

### Widening

The "Widening" Alternative, which consists of straightening, leveling, widening lanes, increasing shoulder widths and improving sight lines, is discussed intermit-

---

**19.**  *Accord, Kleppe v. Sierra Club*, 427 U.S. 390 at 412, 96 S.Ct. 2718 at 2731, 49 L.Ed.2d 576 (1976).

**20.**  The already voluminous record in this case was supplemented by three days of expert testimony on July 26 and 27, 1979 and January 30, 1980.  The hearing on January 30, 1980 resulted from the following letter sent to all parties of record by this Court:

> "On July 27, 1979 this Court denied the admission of the *Madigan-Praeger Report* into evidence and prevented Mr. Tillman, plaintiff's expert, from testifying from the report or using it in anyway to support his testimony.

> A careful review of the entire record and the applicable case law indicates that the decision to exclude the Report and limit the testimony of Mr. Tillman was in error.

> If no objection or request for oral argument is received by January 15, 1980 the report will be admitted into evidence as a full exhibit for the purpose of determining the appropriateness of the methodology used by CDOT and the Secretary's reliance on the information derived therefrom."

Letter from Hon. T. F. Gilroy Daly to all parties of record (Jan. 2, 1980).

tently throughout the EIS. Two of the most important drawbacks of the "Widening" Alternative are first, that the increased capacity of the road will not adequately accommodate future traffic projections and second, an already unacceptably high accident rate would be increased. 3–DEIS at 28–31. A host of other problems cited precludes widening as a viable alternative to the proposed new expressway.[21]

*Mass Transit and Relocation Alternatives*

A comparatively large portion of the EIS is devoted to explaining the "Mass Transit" and the two alternate relocation routes for the new expressway as an alternative to the proposed expressway.[22] Because of the high traffic volume and scattered destinations and purposes of the traffic, the EIS concluded that "rail rapid transit, people movers and exclusive busway forms of mass transit would not meet the needs of Route 7 corridor commuters." 3–DEIS at 33.

Effective utilization of rail rapid transit requires population densities and central city destinations which are not identified with the Route 7 corridor. The EIS estimates that fifty percent of the autodriver work trips are dispersed between over thirty Connecticut and New York towns. 3–DEIS at 32. Computerized elevators, colloquially called people movers, were also rejected because of the need for high density and continuous movement in a relatively small area for effective utilization.

Bus service on existing Route 7 would offer little advantage to the Route 7 traveler. The existing roadway is incapable of providing an express lane, thereby subjecting the bus and its passengers to the same congestion problems experienced by automobile drivers. In addition buses would be hampered by their size in making turns and passing. Providing exclusive bus lanes would encompass the same drawbacks found in the widening alternative, *supra.* In addition, even the busiest Route 7 corridor, between Wilton and Norwalk, fails to possess a population density which would efficiently utilize regular bus service. 3–DEIS at 34–36.

Express bus service was also considered. One of the reasons for rejecting this as a viable alternative was the experience local highway planners have had with a similar project for Hartford, Connecticut commuters. At the time the DEIS was prepared only four percent of the workers coming into Hartford, which has a much higher population density than any town along Route 7, were using the express bus service.

Consideration was also given to upgrading and expanding existing rail service which presently parallels existing Route 7 from Norwalk to Danbury. A 1973 study showed the present line being underutilized by fifty-five percent. Work trips account for ninety-five percent of the rail use with ninety-seven percent destined to Grand Central Station in New York City. Corridor-rail travel is extremely infrequent due in part to the lack of convenient support transportation within the Route 7 corridor. The EIS considered using a collector-distributor bus system to funnel more people to the trains. However, the same shortcomings which plague the express bus service alternative would apply here. While ongoing upgrading of existing rail facilities and implementation of a rail-and-bus service at peak travel times would continue to serve the 1200 workday passengers expected in 1990, there would be no significant diversion from the expected 1990 increase

**21.** 3–DEIS at 54 (2.2 acres of Wooster Mountain State Park would have to be taken), 63 (encroachment upon historic and national landmarks), 72 (increased traffic near schools and playgrounds), 73–74 (interruption and relocation of utility services), 77 (diversion of traffic to residential areas), 94–95 (increased noise level), 125–126 (taking of trees, shrubs and lawns). *See also* FEIS Volume 1–Narrative at 7 (increased air and noise pollution), 28 (excessive right-of-way costs), 228–229, 248 (inability to accommodate future traffic demands), 238–240, 295 (largest displacement of commercial businesses of any alternative.)

**22.** Discussion of the "Mass Transit" alternative may be found at 3–DEIS 31–44 and FEIS Volume 1–Narrative at 146, 172–192, 198, 202, 211, 227, 230–238. Discussion of the two alternative relocation routes may be found at 3–DEIS 44–128 and FEIS Volume 1–Narrative at 7–10, 95, 109–112, 202, 240, 257, 268, 326–328.

in traffic volume to eliminate the need for an improved highway facility.

CBET does not address the lengthy analysis in the EIS of the three alternative sites for building a new expressway. The As Designed Alternative recommended by the State Highway Department "starts at the New Canaan Avenue interchange in Norwalk and proceeds northward on the west side of the Norwalk River Valley along the west side of the Penn Central Railroad tracks. In Wilton, south of Wolfpit Road, it crosses over the railroad tracks and the Norwalk River and proceeds to the east side of existing Route 7. It then crosses over existing Route 7 near Cannondale, and continues northward westerly of Route 7, to the Candees Pond area of Ridgefield. It then recrosses existing Route 7 for the third time near Millers Pond and remains easterly of existing Route 7 into Danbury. Continuing in a northerly direction, it replaces existing Route 7 adjacent to the Wooster Mountain State Park before connecting with I–84 at a point east of the Danbury Airport." 3–DEIS at 45. Alternate 1 diverges from the As Designed Alternate in Wilton, proceeding north to Danbury and remaining east of the As Designed Alternate in the towns of Cannondale, Georgetown and Branchville. Alternate 2 diverges west of the As Designed Alternate at the Merritt Parkway interchange in Norwalk momentarily intersecting the As Designed Alternate in Ridgefield before rejoining the proposed highway in the Sugar Hollow Pond area of Danbury.

The Highway Department's recommendation was made after considering each alternate route's affect on *inter alia* residential and commercial displacement, wildlife, landmarks, natural resources, community services, air, noise and water pollution, aesthetics and cost. Because CBET finds any construction of a new highway system unacceptable, and therefore is silent as to its location, the Court accepts the conclusion in the EIS that the As Designed Alternate is the most viable of the three sites studied.

The plaintiff claims that construction of a new highway facility was a pre-conceived conclusion for which the EIS serves as justification. (Plaintiff's Memorandum of Objections . . . filed May 3, 1979 at 9). CBET alleges that the alternatives discussed are inadequate *per se* and the EIS failed to investigate the alternative of "upgrading" the existing facility and/or failed to analyze a sufficient combination of alternatives which could avoid the need for a new highway facility. (Plaintiff's Brief on Alternatives filed Aug. 10, 1979.)

On January 30, 1980 this Court held a hearing for the purpose of considering the Madigan-Praeger Report (Report) which studied upgrading the existing facility and its effect on the traffic carrying capacity of Route 7. *See* note 20, *infra.* The Report was prepared by URA/Madigan-Praeger, Inc. at the request of the plaintiff. The scope of the Report included studying the traffic carrying capacity of seven intersections along the Route 7 corridor, detailed analysis for two representative intersections, and analysis of a representative rural portion of Route 7. The report concludes that a variety of measures ranging from recent implementation of the "right turn-on-red" law, *Conn.Gen.Stat. Ann.* § 14–299 (Supp.1980), to widening the roadway from two to four lanes would significantly increase the traffic carrying capacity of Route 7. Much of the analysis in the Report was done by the preparers of the EIS. A capacity analysis of seven intersections along the Route 7 corridor appears at 3–DEIS at 30 and Volume 1–Narrative at 135–147. Mr. Robert C. Blumenthal, defendant's expert testified that a cost-benefit study was also done for Route 7 which he reviewed. Though the cost-analysis is not contained within the EIS the results are summarized in Volume 1–Narrative. (Tr. at 83, Jan. 30, 1980.) Implicit in the EIS discussion of the widening alternative, *supra* at 9, is consideration of many of the improvements which are recommended in the Report. The widening alternative encompasses a more extensive upgrading of the existing roadway than contemplated by the Report. This leads the Court to conclude that any specific rejection of an upgrading alternative would be mere surplus-

age to the analysis and rejection of the widening alternative. In addition Mr. Blumenthal pointed out many significant errors contained in the Report leading him to conclude that the report was inaccurate:

> The report, sir, first of all, has no relationship to the Environmental Impact Statement, nor does it attempt to have any relationship to conditions on Route 7 existing or future. As a matter of fact, I believe that if we took the street names, and you have a few, of [sic] the exhibits, it could be anywhere.
>
> The methodology used in the study makes a series of assumptions which do not relate to the real world in existence on Route 7. And through these assumptions presents a, quote, analysis, end quote, of conditions which are assumed. (Tr. at 69–70, Jan. 30, 1980.)

Some of the specific deficiencies noted by Mr. Blumenthal were: (1) failure to take into account side street traffic needs; (2) use of improper commercial vehicle counts affecting capacity measurements; (3) improper utilization of the Highway Capacity Manual; and (4) errors in computations. (Tr. 69–70, Jan. 30, 1980.) As a result of these errors the Report projected a higher vehicle capacity than could actually be obtained. (Tr. at 80, Jan. 30, 1980.) Mr. Blumenthal's assessment of the report was not challenged on cross-examination, nor was the plaintiff's expert, Mr. Raymond Tillman, recalled to rehabilitate the Report's accuracy. Even if the Report were found by the Court to be totally accurate, the testimony of plaintiff's expert indicates that upgrading would only postpone the need for more extensive alternatives to meet expected demand in the Route 7 corridor and that the Report's findings do not demonstrate that the analysis and conclusions in the EIS are incorrect.

■ Plaintiff's reference to Judge Blumenfeld's scholarly and thoughtful opinion in *I–291 Why? Association v. Burns*, 372 F.Supp. 223 (D.Conn.1974), *affirmed*, 517 F.2d 1077 (2d Cir. 1975), to bolster its attack on the alternatives discussed in the EIS is without merit. In *I–291 Why?* the entire EIS was twenty-eight pages long, seven of those pages being devoted to a discussion of alternatives. No data of any kind was provided to support conclusory dismissals of the alternatives studied. In this case the Court is satisfied that the EIS presents "a reasonably comprehensive selection of alternatives, made in good faith." *Monroe County Conservation Council, supra* at 8, 566 F.2d at 425.

If the discussion of alternatives is not *per se* inadequate, CBET argues that the information relied upon to support the conclusion that the alternatives discussed, or a combination thereof, would not satisfy anticipated traffic demands in the near future is wrong. Consideration of this claim requires the Court to entertain plaintiff's objections respecting (1) transportation planning; (2) traffic engineering; and (3) air quality analysis.[23]

■ This Court is neither required, equipped nor inclined to resolve the fervid disagreements between the parties over technical analyses forming the basis for the Highway Department's recommendation that construction of the proposed expressway is the most viable solution to projected traffic needs in the future. The multitudinous EIS as well as the testimony of both sides' experts have been carefully reviewed by this Court. The Court finds the testimony elicited by both sides on July 26 and 27, 1979 credible. However, defendant's experts sufficiently explained what they believed to be the discrepancies in plaintiff's

---

**23.** CBET's specific objections are (1) CDOT failed to validate its traffic projections with updated data; (2) CDOT relied on unvalidated travel speed projections; (3) CDOT relied on erroneous capacity calculations; (4) CDOT knowingly continued to rely on improper information; (5) CDOT and FHWA failed to consider important factors in their projections of induced traffic and capacity restraint; (6) CDOT relied on unvalidated input data that distorted air quality analysis; (7) CDOT improperly limited its forecasts to the year 1990; (8) CDOT's projections for induced growth are unreasonably low; (9) CDOT failed to update their information between the DEIS and the FEIS; and (10) CDOT failed to adequately take into account the energy crisis.

criticism of the EIS to warrant this Court to find that the plaintiff has fallen far short of meeting the burden necessary to set aside the decision of the agency. *See* text, *supra* at 4–7 and notes 16 & 17, *infra.*

For the reasons stated in this opinion and, by way of adoption, based on the findings and conclusion set forth in Defendant-Intervenors' memoranda in support of Defendants' Motion to Vacate the Permanent Injunction, filed March 30 and August 17, 1979, *compare Monroe County Conservation Council v. Adams,* 566 F.2d 419, 425 n.7 (2d Cir.), *cert. denied,* 435 U.S. 1006, 98 S.Ct. 1876, 56 L.Ed.2d 388 (1978), the intervenor's motion to vacate the injunction entered by Judge Newman on July 7, 1972 is hereby GRANTED.

It is So Ordered.