CITIZENS FOR BALANCED ENVIRON-
MENT AND TRANSPORTATION,
INC., et al., Plaintiffs-Appellants,

v.

John A. VOLPE, et al.,
Defendants-Appellees.

No. 489, Docket 80–6148.

United States Court of Appeals,
Second Circuit.

Argued Jan. 15, 1981.

Decided June 9, 1981.

Gregor I. McGregor, Boston, Mass., for plaintiffs-appellants.

Kenneth N. Tedford, Asst. Atty. Gen., Wethersfield, Conn. (Carl R. Ajello, Atty. Gen., Hartford, Conn.), for defendant-appellee Connecticut Dept. of Transp.

Francis J. McNamara, Jr., Stamford, Conn. (Cummings & Lockwood, Gary A. MacMillan, Stamford, Conn., of counsel), for defendant-intervenor appellees.

Richard Blumenthal, U. S. Atty. for the District of Connecticut, New Haven, Conn. (George J. Kelly, Jr., Asst. U. S. Atty., Hartford, Conn., of counsel), for federal defendants-appellees.

The Connecticut Fund for the Environment, Daniel Millstone, New Haven, Conn., of counsel, on amicus curiae brief.

Before MOORE, MANSFIELD and MULLIGAN,* Circuit Judges.

MOORE, Circuit Judge:

Plaintiff-appellant, Citizens for Balanced Environment and Transportation (CBET), a citizens' group, appeals the decision of Judge T. F. Gilroy Daly of the United States District Court for the District of Connecticut, vacating an injunction that has been in effect since 1972. The injunction which had been entered on July 17, 1972 by then District Judge Jon O. Newman prohibited responsible agencies from further construction of a U. S. highway in Connecticut until an Environmental Impact Statement (EIS) had been prepared pursuant to § 102(2)(C) of the National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. § 4332(2)(C). Upon completion of the EIS, the agencies charged with the highway's construction, the United States Department of Transportation (DOT), the Federal Highway Administration (FHWA), and the Connecticut Department of Transportation (ConnDOT) by motion sought to have the injunction vacated so that construction could begin.

This case comes to us after lengthy governmental and judicial proceedings.

The controversy surrounds the proposed construction of a new expressway to replace the present U. S. Route 7 between Norwalk and Danbury, Connecticut. The distance to be covered by this proposed roadway is roughly twenty miles. Construction would act to relocate the existing Route 7, a major, though antiquated, north-south highway in the Western part of Connecticut. The new highway would also provide a link between two east-west highways—Interstate 95 in the South and Interstate 84 in the North, both completed some time ago.

As early as 1957 the State of Connecticut began to consider appropriate measures to improve conditions on this leg of Route 7.[1] Investigations were made by the Connecticut Highway Department (now Connecticut Department of Transportation) for possible routes for the new expressway between 1957 and 1962. Public hearings were held in towns to be affected by the expressway[2] between 1961 and 1965. In 1967, following the authorization of necessary funds by the Connecticut legislature, construction began on a one and one-half mile stretch of the road between I–95 and New Canaan Avenue in Norwalk. This segment was completed in 1971.

The judicial history of this case begins after the completion of the first section of the new Route 7 and before construction was to begin further north toward Wilton. At that time a citizens' group, Committee to Stop Route 7 (predecessor of appellants in this appeal) entered Federal Court and successfully sought an injunction against the DOT, FHWA, and ConnDOT to stop further construction.

The injunction was issued by United States District Judge Newman on July 17, 1972. *Committee to Stop Route 7 v. Volpe,* 346 F.Supp. 731 (D.Conn.1972). Plaintiff's principal contention was that the defend-

---

* Judge Mulligan concurred in the disposition of this matter prior to his retirement from the Bench but did not have an opportunity to review the written opinion. Accordingly, the remaining two members of the panel submit this opinion pursuant to § 0.14(b) of the Rules of the United States Court of Appeals for the Second Circuit.

1. The General Assembly of the State of Connecticut first authorized Relocated Route 7 by adopting Special Act 399 approved on May 28, 1957.

2. Norwalk in 1961; Wilton in 1964 and in Ridgefield, Redding and Danbury in 1965.

ants failed to prepare a detailed environmental impact statement as required by the National Environmental Policy Act of 1969, § 102(2)(C).[3] Defendants claimed that although the project was a major Federal action "significantly affecting the quality of the [human] environment" under the meaning of § 102(2)(C), no EIS was required because years of planning had gone into the proposed highway[4] before the effective date of NEPA.

Judge Newman held that the clear mandate of Congress required an EIS before construction of the highway could resume. Accordingly, defendants were enjoined from "taking any steps to construct any portion of relocated Route 7 until such a statement has been prepared according to the provisions of § 102(2)(C) of the National Environmental Policy Act". D.C., 346 F.Supp. 731, 742.

In response to the 1972 injunction the Commissioner of ConnDOT and the FHWA Division Administrator successfully obtained funding necessary for the preparation of an EIS. A draft EIS (DEIS)[5] was prepared by ConnDOT after the compilation of social, environmental and economic information and analysis of independent studies. The DEIS was circulated by January 1974 to appropriate governmental and other interested agencies and the public for comment.

*The DEIS*

The DEIS is a document of 155 pages, exclusive of 33 tables containing information related to the chapter headings: 25 maps, charts, diagrams and statistics; and an appendix of 27 pages consisting largely of actions taken by agencies of certain towns with respect to the proposed new route.

The index of the Chapter headings is indicative of the broad coverage of the DEIS. The first four chapters covered "I. Description of Project and Study Area" with seven subheadings; "II. Preliminary Alternatives" with four subheadings; "III. Analysis of Feasible Alternatives" with eight subheadings; and "IV. Probable Impact of the Proposed Project on the Environment" with seven subheadings. The last four chapters dealt with "VI. Probable Adverse Environmental Effects which cannot be avoided"; "VII. Irreversible and Irretrievable Commitment of Resources"; "VIII. Short term effects and Long Term Productivity"; and "IX. Steps to Minimize Harm".

After circulation of the DEIS which was approved by ConnDOT and FHWA on January 17, 1972 and January 23, 1974, respectively, a Final Environmental Impact Statement (FEIS)[6] was prepared and issued under the signatures of the Commissioner of ConnDOT (May 24, 1977), the Division Administrator of FHWA (May 26, 1977) and

3. Section 102(2)(C) of NEPA, 42 U.S.C. § 4332(2)(C) provides:
"(2) all agencies of the Federal Government shall—
(C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—
(i) the environmental impact of the proposed action,
(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,
(iii) alternatives to the proposed action,
(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and
(v) any irreversible and irretrievable commitments of resources which would be in-

volved in the proposed action should it be implemented."

4. Which, at the time of this action, was to extend north of Danbury to New Milford, Connecticut.

5. A Draft EIS is defined as "a document which contains an assessment of the significant effects a major action will have upon the quality of the human environment". 23 C.F.R. § 771.-3(i) (1980).

6. A Final EIS is defined as a "detailed statement on a major action which significantly affects the quality of the human environment ... [containing] the same supporting information required in the draft EIS with appropriate revisions to reflect comments received from circulation of the draft EIS and the public hearing process." 23 C.F.R. § 771.3(j) (1980).

the Director of the Office of Environment and Design of FHWA (August 14, 1978).

*The Final Environmental Impact Statement*

The first volume of the FEIS (pp. 1–391) described as "Narrative" defines the scope of the twenty-four chapters contained therein which, in brief, covers traffic, water quality, noise, air quality and alternative considerations. Referring to "Alternatives" there follows a detailed discussion which, after stating that "Highway Alternatives should be carefully evaluated in studying a highway's impact upon the environment", refers to the DEIS saying "This has been done for Route 7, as documented on pages 25 through 192 of the Draft Environmental Impact Statement" and further that "Additional considerations regarding alternatives were reviewed as the result of comments received from circulation of the draft EIS as noted in the following response to those inquiries". (Here follows an extensive consideration of "do-nothing", "widening" and "mass transit" alternatives together with the pros and cons of each. The conclusion was reached that: "The 'do-nothing' and the 'widening' alternatives do not appear to provide reasonable solutions for the transportation needs of the corridor". Vol. 1, p. 227.

By motions made on March 29, 1979 supported by voluminous affidavits and exhibits, ConnDOT, DOT, and FHWA moved to vacate the road-building injunction claiming that the FEIS approved in August 1978 satisfied the decision of Judge Newman and the requirements of NEPA. A group of corporations interested in the proposed expressway filed their own motion to vacate on March 30, 1979 as defendant-intervenors, CBET opposed, claiming, in substance, that the FEIS consisting of four bulky volumes (Vol. 1—392 pages; Vol. 2a—683 pages; Vol. 2b—584 pages; Vol. 3—196 pages) was inadequate.

The motion to vacate came on to be heard on July 19, 1979 before the Honorable T. F. Gilroy Daly. The court proceedings from then on assume more than ordinary importance. Judge Daly had raised the question whether "oral argument [should] be presented on the question of whether the Court should, under the cases, hear further testimony with regard to the FEIS". (Supplement to Record on Appeal [SR] 2).

Lengthy argument was addressed to this question by all counsel. Counsel for CBET wished to present witnesses "to testify in rebuttal to what the agency claims justifies the final Environmental Impact Statement". SR 19, *i. e.*, as expert witnesses Messrs. Morris and Ketcham. It also wished to offer a report referred to as the Madigan-Praeger report allegedly showing that "alternatives would make unnecessary the construction of the new road". SR 17. At the conclusion of extended argument the court ruled "I'm going to allow the taking of evidence on the limited question of whether or not the agency's research or analysis was clearly inadequate . . . . I am simply interested in whether or not a reasonable person could have relied on the methodology the administrator did in arriving at the conclusions he did in the areas that are addressed in the offer of proof". SR 43. Accordingly, the case was set down for hearing on July 26, 1979.

Plaintiffs called three witnesses—Robert L. Morris, a traffic engineer and transportation planner (SR 8–200); Brian Ketcham, an air pollution control engineer (SR 200–277); and Raymond Tillman, a transportation planner and a vice-president of the engineering firm of Madigan-Praeger, Incorporated. (SR 277–422).

A series of conclusory questions brought forth from the experts their opinions as to what the agency involved should have considered. Mr. Morris, among other comments, expressed his opinion that "they [the agency] did not consider all relevant factors". SR 65. Mr. Ketcham believed that the FHWA (the administrator) did not make a "fully informed decision regarding the air quality aspects of this project and existing Route 7". (SR 245–246). Mr. Tillman, an officer of Madigan-Praeger, addressed himself largely to the benefits to be obtained by upgrading certain parts of existing Route 7. (SR 277–423).

The defendants countered with qualified experts, Robert C. Blumenthal and Paul Morgenstern. Mr. Blumenthal is a Registered Professional Engineer with a wide experience in traffic engineering. He gave as his opinion that plaintiffs' "Speed and Delay Runs", tests greatly relied on by CBET, did not cast doubt on methods used, or the conclusions reached, in the EIS (SR 443). He had personal experience in driving over Route 7 in three peak hours. He testified that a reasonable man could rely on the traffic data in the EIS. (SR 448). Mr. Morgenstern is an expert in the field of air pollution and testified in substance that the air quality study in the EIS was within the state of the art when made. (SR 550).

After the hearings in July 1979 were concluded, the trial court decided, on notice to counsel, to hold a hearing with respect to the admissibility of the Madigan-Praeger Report, which had been excluded in the July hearings. A hearing on renewed objections to admissibility was held on January 30, 1980. Mr. Tillman and Mr. Blumenthal, called by CBET, testified. The court held that "in the interests of the completeness of the record, [he] should let it in", and commented with prophetic accuracy: "Somebody is bound to take this case up". (SR Vol. IV, p. 4). The Report, made under Mr. Tillman's supervision, devoted itself largely to ways by which the traffic capacity of present Route 7 could be materially increased by rather inexpensive alterations in the road at its various intersections. Seven intersections were selected as the most "troublesome". The nature of the report is best described by Mr. Tillman himself. "This report does not address whether or not an upgrading of Route 7 is or is not sufficient to meet future demand. It only states that there clearly are improvements that could be made that can substantially increase the carrying capacity of Route 7." (SR 50). Mr. Blumenthal had contrary views.

*The Trial Court's Opinion*

In defining the role of the court, under the heading "JUDICIAL REVIEW UNDER NEPA", the court, for guidance, referred in particular to two recent Supreme Court cases, *Vermont Yankee Nuclear Power Corp. v. HRDC*, 435 U.S. 519, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978); *Strycker's Bay Neighborhood Council v. Karlen*, 444 U.S. 223, 100 S.Ct. 497, 62 L.Ed.2d 433 (1980) and a case in this Circuit, *County of Suffolk v. Secretary of Interior*, 562 F.2d 1368 (2d Cir.), *on remand* 76 F.R.D. 469 (E.D.N.Y., 1977), *cert. denied*, 434 U.S. 1064, 98 S.Ct. 1238, 55 L.Ed.2d 764 (1978).

Under the heading of "ALTERNATIVES" the trial court pointed to four alternatives investigated by the Highway Department in determining "how to best alleviate present traffic problems and to satisfy future needs", namely, Do Nothing, Widening, Mass Transit and Relocation. In the opinion and by extensive footnotes reference was made to discussion of these topics in the DEIS and the FEIS.

The court found "the testimony elicited by both sides on July 26, and 27, 1979 credible" but chose to honor "the decision of the agency". The scope of the court's review is clear: "The multitudinous EIS as well as the testimony of both sides' experts have been carefully reviewed by this Court". The court concluded: "For the reasons stated in this opinion and, by way of adoption, based on the findings and conclusion set forth in Defendant-Intervenors' memorandum in support of Defendants' Motion to Vacate the Permanent Injunction, filed March 30 and August 17, 1979, *compare Monroe County Conservation Council v. Adams*, 566 F.2d 419, 425 n.7 (2d Cir.), *cert. denied*, 435 U.S. 1006 [98 S.Ct. 1876, 56 L.Ed.2d 388] (1978), the intervenor's motion to vacate the injunction which had been entered by Judge Newman on July 7, 1972 is hereby GRANTED".

CBET appeals Judge Daly's ruling on four grounds. First, that the District Court applied the wrong standard of judicial review in its examination; second, that the District Court's review was procedurally inadequate because it did not examine with sufficient depth the technical data presented in the EIS; third, that the EIS was insufficient because it did not include tech-

nical material in the possession of ConnDOT or presented by CBET; and fourth, that the District Court was mistaken because it did not make its own factual findings, but adopted the findings of the defendant-intervenor's in its final opinion.

*The Standard of Review*

■ The appropriate role of the courts in reviewing compliance with NEPA requirements is by now well settled.[7] The Supreme Court has stated: "NEPA does set forth significant goals for the Nation, but its mandate to the agencies is essentially procedural". *Vermont Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 558, 98 S.Ct. 1197, 1219, 55 L.Ed.2d 460 (1978). The court's duty is "to insure a fully informed and well-considered decision ..." by the agency through its compliance with the requirements of NEPA, *id.* Once it is determined that an agency decision has been made subject to NEPA's procedural requirements, "the only role for a court is to insure that the agency has considered the environmental consequences; it cannot 'interject itself within the area of discretion of the executive as to the choice of the action to be taken.'" *Strycker's Bay Neighborhood Council v. Karlen*, 444 U.S. 223, 227–228, 100 S.Ct. 497, 500, 62 L.Ed.2d 433 (1980), *quoting Kleppe v. Sierra Club*, 427 U.S. 390, 410 n.21, 96 S.Ct. 2718, 2730 n.21, 49 L.Ed.2d 576 (1976).

In this Circuit, Judge Mansfield in *County of Suffolk v. Secretary of Interior*, 562 F.2d 1368, 1383 (2d Cir. 1977), *cert. denied*, 434 U.S. 1064, 98 S.Ct. 1238, 55 L.Ed.2d 764 (1978) has stated the appropriate standard:

"The district court does not sit as a superagency empowered to substitute its scientific expertise or testimony presented to it *de novo* for the evidence received and considered by the agency which prepared the EIS. [Citation omitted.] The court's task is merely 'to determine whether the EIS was compiled in objective good faith and whether the resulting statement would permit a decision maker to fully consider and balance the environmental factors.' [Citation omitted.] 'The court is not empowered to substitute its judgment for that of the agency.' [Citations omitted.] This is particularly true when it comes to evaluating the factual conclusions of the EIS. If the agency's conclusions have a 'substantial basis in fact,' [citation omitted], and if the EIS has set forth responsible opposing scientific views, [citation omitted], it is not for the district court to resolve conflicting scientific options. Evidence-weighing must be left to the agency making the policy decision. [Citation omitted.]"

Judge Mansfield also stated:

"In making such a determination a court is governed by the 'rule of reason,' under which an EIS need not be exhaustive to the point of discussing all possible details bearing on the proposed action but will be upheld as adequate if it has been compiled in good faith and sets forth sufficient information to enable the decisionmaker to consider fully the environmental factors involved and to make a reasoned decision after balancing the risks of harm to the environment against the benefits to be derived from the proposed action, as well as to make a reasoned choice between alternatives. [Citations omitted.]" 562 F.2d at 1375.

In his opinion Judge Daly summarized the appropriate standard as follows:

"The court's role in overseeing compliance with NEPA is to determine first, whether the agency has substantially

7. This Circuit is not new to its consideration. See *Monroe County Conservation Council v. Adams*, 566 F.2d 419 (2d Cir. 1977), *cert. denied*, 435 U.S. 1006, 98 S.Ct. 1876, 56 L.Ed.2d 388 (1978); *County of Suffolk v. Secretary of Interior*, 562 F.2d 1368 (2d Cir.), *cert. denied*, 434 U.S. 1064, 98 S.Ct. 1238, 55 L.Ed.2d 764 (1978); *Natural Resources Defense Council, Inc. v. Callaway*, 524 F.2d 79 (2d Cir. 1975); *Chelsea Neighborhood Assns. v. U. S. Postal Service*, 516 F.2d 378 (2d Cir. 1975); *Greene County Planning Board v. FPC*, 455 F.2d 412 (2d Cir.), *cert. denied*, 409 U.S. 849, 93 S.Ct. 56, 34 L.Ed.2d 90 (1972); *Scenic Hudson Preservation Conference v. FPC*, 453 F.2d 463 (2d Cir.), *cert. denied*, 407 U.S. 926, 92 S.Ct. 2453, 32 L.Ed.2d 813 (1972); *Monroe County Conservation Council, Inc. v. Volpe*, 472 F.2d 693 (2d Cir. 1972).

complied with the procedural mandate of the statute; and second, has the agency, in satisfying that mandate, undertaken a comprehensive, good-faith consideration of the consequences of its action." *Citizens for Balanced Environment and Transportation, Inc. v. Volpe,* 515 F.Supp. 151 at 155 (D.Conn., 1980).

CBET urges upon us the view that this standard is incorrect, that the district court's role is to oversee an agency's strict procedural compliance with NEPA, and that substantial compliance is not sufficient. By strict procedural compliance CBET apparently would have the trial court and this Court examine the data that are the basis of agency decisions made under NEPA.

■ CBET asserts that the proper standard of review to be applied here is that the reviewing court must

"take a 'hard look' at the agencies' process in compiling the EIS, inquiring into the choice of data, assumptions used, methodologies chosen, and other basic factors which contribute to the decision-making document...."[8]

As we have noted in the past:

"allegations that an EIS has neglected to mention a serious environmental consequence, failed adequately to discuss some reasonable alternative, or otherwise swept 'stubborn problems or serious criticism ... under the rug,' [citation omitted], raise issues sufficiently important to permit the introduction of new evidence in the district court, including expert testimony with respect to technical matters, both in challenges to the sufficiency of an environmental impact statement and in suits attacking an agency determination that no such statement is necessary." *County of Suffolk v. Secretary of Interior,* 562 F.2d at 1385.

Applying this standard, Judge Daly properly discharged his responsibility by holding a hearing which gave the appellants full opportunity to present witnesses stating their views as to the inadequacy of the EIS and by permitting the introduction of a report supporting appellants' claim. Judge Daly carefully reviewed this material. Appellants' argument that the standard of review which he applied here was incorrect must therefore be rejected.

In its argument on appeal, CBET concedes that it does not seek a reversal of the substantive agency decision to continue the construction of a new Route 7. Instead, CBET claims that the agency decision should be set aside for procedural inadequacies. The question before us then is whether CBET's claim amounts to a reversible procedural defect in the FEIS. "Administrative decisions should be set aside in this context, as in every other, only for substantial procedural or substantive reasons as mandated by statute...." *Vermont Yankee Nuclear Power Corp. v. NRDC,* 435 U.S. 519, 558, 98 S.Ct. 1197, 1219, 55 L.Ed.2d 460.

■ The basis of appellants' challenge to the FEIS appears to be that certain data which was compiled by CBET and ConnDOT was not included or discussed in the final report. The material includes CBET challenges to the validity of models used to forecast future traffic patterns, other information compiled by CBET to prove its position, and field tests of studies conducted by ConnDOT and CBET which allegedly disproved the conclusion of the FEIS. CBET cites the language in Judge Mansfield's opinion in *County of Suffolk v. Secretary of Interior, supra,* which states that the district court should see that the decision-makers considered "all significant environmental factors...." 562 F.2d 1369, 1383, in preparing an EIS. CBET reads this as imposing a burden on the agency to examine every available piece of relevant information and to set it forth in its final report. Applying this standard, appellants argue, would lead to a finding that procedural error was committed in the preparation of the FEIS which renders it inadequate.

Although the particular data which CBET would have had included in the FEIS

---

**8.** Appellants' br., pp. 13–15.

is not set out and discussed separately in that document, it is evident that ConnDOT gave careful consideration to the problem toward which the data was directed. ConnDOT implicitly considered and rejected the information as flawed and not in direct conflict with the computer model relied upon by it. Thus, there was substantial compliance by the agency with its obligation to consider all relevant environmental factors.

■ CBET further argues that the district court did not consider in sufficient depth the technical materials included in the FEIS, in order to determine its procedural adequacy. In fact, Judge Daly responded to CBET's allegations by holding a hearing on January 30, 1980 to consider the implications of the technical inaccuracies which CBET claimed existed in the FEIS. Following this hearing Judge Daly concluded that CBET had fallen far short of meeting its burden necessary to set the agency decision aside.[9] He declined further investigation, saying: "This Court is neither required, equipped nor inclined to resolve the fervid disagreements between the parties over technical analyses forming the basis for the Highway Department's recommendation that construction of the proposed expressway is the most viable solution to projected traffic needs in the future".[10] There is no duty for the district court to embroil itself in the type of detail which CBET urges is necessary to determine if there has been procedural compliance with NEPA. Clothing its complaint as "procedural" is an inventive way for CBET to invite the court to enter the very areas forbidden to it. CBET would have the court act as the decisionmaker in the guise of securing procedural compliance. As Judge Mansfield stated: "The district court does not sit as a super-agency empowered to substitute its scientific expertise or testimony presented to it de novo for the evidence received and considered by the agency which prepared the EIS". *County of*

*Suffolk v. Secretary of the Interior, supra* at 1383. Deciding technical disputes between contesting parties is not the means by which the procedural sufficiency of an FEIS will be measured by the court.

After a careful review of the record, an examination of the DEIS and FEIS and notice taken of CBET's specific objections to the document, Judge Daly properly ruled that the FEIS was sufficient.

*Adoption of Findings*

■ Finally, CBET argues that Judge Daly abdicated his fact-finding responsibility because his ruling was based on his opinion and "[B]y way of adoption, based on the findings and conclusion set forth in Defendant-Intervenors' memoranda in support of Defendants' Motion to Vacate the Permanent Injunction, filed March 30 and August 17, 1979."[11] Under the facts of this case we do not agree.

The case upon which Judge Daly relied in taking this action is *Monroe County Conservation Council v. Adams*, 566 F.2d 419, 425 n.7 (2d Cir.), *cert. denied*, 435 U.S. 1006, 98 S.Ct. 1876, 56 L.Ed.2d 388 (1978). In that case, a district court judge adopted the findings of fact and conclusions of law of the government with regard to an EIS the day immediately following oral argument where the judge had indicated that he had not read the voluminous documents upon which his opinion hinged. The opinion of the district court was upheld, but not without comment from the Second Circuit, which characterized the judge's action as a "cursory treatment of the issues in this case".

A comparison of *Monroe County* with the case currently before us leads us to conclude that Judge Daly's action was quite different from the one described above. Before Judge Daly adopted the findings offered by the defendants-intervenors he had already demonstrated that he had made a careful review of all elements of the case

---

**9.** *Citizens for Balanced Environment and Transportation, Inc. v. Volpe*, at 162 (D.Conn., 1980).

**10.** *Id.* at p. 161.

**11.** *Id.* at p. 162.

before him. His opinion consists of a detailed and reasoned discussion of major elements of the case. Nothing in the record indicates that the district court's review of CBET's claims was cursory.

The district court is entitled to adopt findings offered by a party to an action. If the findings are supported by the evidence, as here, they will stand. *United States v. El Paso Natural Gas Co.*, 376 U.S. 651, 656, 84 S.Ct. 1044, 1047, 12 L.Ed.2d 12 (1964). In this case, Judge Daly's choice to adopt certain findings made by the defendants-intervenors in addition to his own does not alter the fact that his review of the pertinent issues was made with great care. Furthermore, this Court, after an equally careful review, finds the conclusions set forth therein well supported by the record.

The judgment of the district court is affirmed.